IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

SEPTEMBER SESSION, 1999

FILED

December 7, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, M1999 01439 CCA R3 CD | ) | C.C.A. # |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | DICKSON COUNTY |
| VS. | ) | |
| | ) | HON. ALLEN WALLACE, |
| RONALD WAYNE SMITH, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Certified Question-Search) |

ON APPEAL FROM THE JUDGMENT OF THE
CIRCUIT COURT OF DICKSON COUNTY

FOR THE APPELLANT:                    FOR THE APPELLEE:

MICHAEL J. FLANAGAN                   PAUL G. SUMMERS
95 White Bridge Road #208             Attorney General and Reporter
Nashville, TN 37205
                                      ELIZABETH T. RYAN
                                      Assistant Attorney General
                                      425 Fifth Avenue North
                                      Nashville, TN 37243

                                      DAN ALSOBROOKS
                                      District Attorney General

                                      SUZANNE LOCKERT
                                      Assistant District Attorney General
                                      P.O. Box 580
                                      Charlotte, TN 37036

OPINION FILED _____

REVERSED; CONVICTION VACATED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Ronald Wayne Smith, pleaded guilty in the Circuit Court of Dickson County to possession of cocaine for resale and possession of marijuana for resale, reserving a certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2)(i). The certified question of law is whether there were sufficient specific and articulable facts to justify the stop of the Defendant's vehicle and/or whether the duration of the stop excessive. We find that there were not sufficient specific and articulable facts to justify the stop of the Defendant's vehicle. Because we conclude that the stop was illegal, we reverse the order of the trial judge overruling the motion to suppress.

Before pleading guilty in this case, the Defendant filed a motion to suppress the evidence seized in the warrantless search of his vehicle, which motion was denied by the trial court after a suppression hearing. The only witness to testify at the hearing was Mark Norrod, the State Trooper who stopped the Defendant's vehicle. Trooper Norrod testified that he was patrolling Interstate 40, traveling eastbound, on October 7, 1997. He was traveling behind the Defendant's vehicle. He could not recall how much distance was between his vehicle and the Defendant's vehicle, but said that the Defendant's vehicle was "within eyesight." He observed the Defendant's vehicle change lanes twice without giving a signal, while in the process of passing another vehicle. After the Defendant's vehicle passed the other vehicle and returned to the right lane of travel, it was driving on the white line near the edge of the roadway. Trooper Norrod did not say that the Defendant's vehicle created any type of hazard or that it almost caused an accident by changing lanes without signaling. He could not remember the other vehicle applying brakes or taking any sort of evasive action due to the Defendant's vehicle passing it without signaling. Though he asserted that the lane change was "improper," Trooper Norrod did not classify this lane change as a "flagrant violation." He could not recall for what distance the

Defendant's vehicle drove on the white line, but he did admit that the Defendant did not endanger himself or anyone else by driving on the white line. After viewing the Defendant make this lane change, Trooper Norrod stopped the vehicle and started to give the Defendant a warning ticket for making an improper lane change.

At the suppression hearing, defense counsel attempted to clarify the reason Trooper Norrod stopped the Defendant's car, and the following colloquy occurred:

> Q. Was there anything else suspicious about the car other than the way he changed lanes?
> A. I'm sorry, what do you mean by suspicious?
> Q. Anything suspicious to you about that car that made you curious about it?
> A. He failed to give a signal and that's what I stopped him for.
> Q. Anything other than that?
> A. No, sir, that's why I stopped him.
> Q. There was no other reason, other than that, for you to stop him; is that right?
> A. That's correct.

Trooper Norrod asked the Defendant to get out of the car and move to the rear of the car so that he could get away from the roadway while he wrote the ticket. The Defendant locked the doors when he got out of the car. Trooper Norrod engaged the Defendant in conversation while he was preparing the ticket. The Defendant told him that he had flown from Louisville, Kentucky to El Paso, Texas to look for a friend; he then rented a car and was returning to Kentucky when he could not find his friend. The car rental agreement required that the car be returned in El Paso in three days. The Defendant also told Trooper Norrod that he was on disability. These comments made Trooper Norrod suspicious, and he asked for consent to search the vehicle. The Defendant agreed to the search, and when the Defendant opened the trunk, Trooper Norrod smelled a strong odor of marijuana. He immediately placed the Defendant under arrest and then unzipped a duffle bag in the trunk, where he discovered a large quantity of

-3-

a substance believed to be marijuana. Another officer came to assist in the search of the vehicle, and a substance believed to be cocaine was found as well.

When Trooper Norrod turned on his blue lights to stop the Defendant's vehicle, the video camera in the police car was automatically activated. The tape does not show the lane change, but instead shows the Defendant driving in the right-hand lane of traffic and pulling off the road. No other traffic is seen immediately around the Defendant's car. On the tape, Trooper Norrod is heard telling the Defendant that he pulled him over because he changed lanes without signaling, he was "riding" the white line, and he did not know if the Defendant was drunk or tired. He asked the Defendant to get out of the car and then engaged the Defendant in conversation while he was preparing the ticket. Immediately after he handed the Defendant the ticket, he asked if he could search the car, to which the Defendant replied, "yeah, sure." The Defendant opened the car and the trunk for Trooper Norrod, who leaned into the trunk and then promptly arrested the Defendant. The time between the stop and the arrest was approximately seven minutes.[1]

After argument of counsel, the trial court issued its ruling. The judge began with the following statement:

> You know, I look at this case a little different I think than both of you do.
> First off, this patrolman is out there on the road patrolling, to see what's going on, and he sees a vehicle, not that he's violated the law, but that he's not driving like everybody else. He's hugging the right line. It's not a random stop. It's not just random looking for somebody. Here is a car kind of acting a little strange.
> Now, what's he going to do? Let it go, or follow him until he runs off the road or something or just investigate it? He's not looking for any violations of the law, he's just investigating it. Here's a car that has not been doing just right, so he puts his blue lights on and pulls him over to investigate.

---

[1] We find no merit to the Defendant's argument that the duration of the stop was excessive. It is only the initial stop of the Defendant's vehicle that we find to be an unreasonable seizure.

The trial judge then found that Trooper Norrod was justified in becoming suspicious of the Defendant after talking to the Defendant for a few minutes and further found that the search was consensual. He stated, "I can't see anything in this case, Mr. Quillen, that I think makes this stop and the ultimate search of the car even constitutional [sic] suspect" and denied the motion to suppress.

When reviewing the grant or denial of a motion to suppress,

[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the application of the law to the facts as found by the trial court is a question of law which the appellate court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Beare Co. v. Tennessee Dept. of Revenue, 858 S.W.2d 906, 907 (Tenn. 1993)). Because only Trooper Norrod testified at the suppression hearing, the facts presented at the hearing are basically undisputed. Therefore, only questions of law are at issue before this Court.

The Fourth Amendment to the United States Constitution provides:

**Unreasonable searches and seizures.**–The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, Article I, § 7 of the Tennessee Constitution guarantees

that the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

-5-

The intent and purpose of the prohibition against unreasonable searches and seizures found in the Tennessee Constitution has been found to be the same as that found in the Fourth Amendment to the United States Constitution. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998) (citing State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997); Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). According to the Supreme Court, the purpose of the prohibition against unreasonable searches and seizures in the Fourth Amendment is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." Camara v. Municipal Court, 387 U.S. 523, 528 (1967). The Fourth Amendment protects people, not places, wherever they may have a "reasonable expectation of privacy." Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

Under both the United States and Tennessee Constitutions, a search or seizure conducted without a warrant is presumed unreasonable. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); Simpson, 968 S.W.2d at 780; State v. Watkins, 827 S.W.2d 293, 295 (Tenn. 1992). Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless that search or seizure was conducted pursuant to one of the recognized exceptions to the warrant requirement. Id.

One such exception to the warrant requirement is known as the automobile exception. In Carroll v. United States, 267 U.S. 132 (1925), the Supreme Court held that police officers could search an automobile without a warrant if the officers had probable cause to believe that the automobile contained contraband. Carroll v. United States, 267 U.S. 132, 149 (1925). Such a search is deemed reasonable "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought," making it impractical to secure a warrant before searching the automobile. Id. at 153; see also Chambers v. Maroney, 399 U.S. 42, 51 (1970). In addition to the exigency created by the

mobility of automobiles, the Supreme Court has upheld searches of automobiles based in part on a notion that there is a "lesser expectation of privacy" in automobiles. See California v. Carney, 471 U.S. 386 (1985); Cardwell v. Lewis, 417 U.S. 583 (1974). A four-justice plurality in Cardwell v. Lewis declared that a person has a

> lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view.

Cardwell, 417 U.S. at 590. Eleven years later, in California v. Carney, a majority of the Supreme Court expressly applied both rationales to uphold the warrantless search of a vehicle in a criminal investigation, explaining that persons have a lesser expectation of privacy in automobiles due "to the pervasive regulation of vehicles capable of traveling on the public highways." Carney, 471 U.S. at 392.

While an individual in an automobile may have a "lesser expectation of privacy," that individual does not "lose all reasonable expectation of privacy" when he or she enters that automobile. See Delaware v. Prouse, 440 U.S. 648, 662 (1979). As the Supreme Court has stated, "[w]ere the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed." Id. at 662-63. This is why individualized suspicion is generally required before an automobile may be searched or seized. See id. at 654-55.

The stop of an automobile and the detention of its occupants constitutes a seizure, even if the purpose of the stop is limited and the detention is brief. Wren v. United States, 517 U.S. 806, 809-10; Delaware v. Prouse, 440 U.S. 648, 563 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556-58 (1976); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997). A police officer may stop or "seize" an automobile if the officer has probable cause to believe that a criminal offense has occurred or that a traffic violation has occurred. Wren, 517 U.S. at

810; Prouse, 440 U.S. at 655, 659; Vineyard, 958 S.W.2d at 734. If the officer has probable cause to believe that a violation of the traffic code has occurred, the seizure will be upheld even if the stop is a complete pretext for the officer's subjective motivations in making the stop. Wren, 517 U.S. at 813-17; Vineyard, 958 S.W.2d at 734-35.

In some circumstances, a police officer may also stop or "seize" an individual in the absence of probable cause. In Terry v. Ohio, 392 U.S. 1, 30 (1968), the Supreme Court approved the limited and temporary seizure of a person for questioning and for a "pat-down" for weapons if an officer has a "reasonable suspicion" that the person is armed and dangerous. The Court assessed the reasonableness of the officer's actions by "'balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" Id. at 21 (quoting Camara v. Municipal Court, 387 U.S. 523, 534-35 (1967)). To justify an intrusion into a person's expectation of privacy, the officer must "point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. This limited Terry-type seizure doctrine has been expanded to allow limited and temporary seizures of individuals for questioning if an officer has a reasonable suspicion that an individual has been involved in or is about to be involved in criminal activity. See United States v. Brignoni-Ponce, 422 U.S. 873, 880-81 (1975). Now, a police officer may seize an automobile and question its occupants if the officer has reasonable suspicion, based on specific and articulable facts, that the occupants have been involved in or are about to be involved in criminal activity. Ornelas v. United States, 517 U.S. 690, 693 (1996); Prouse, 440 U.S. at 663; State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997).

"Reasonable suspicion" is an objective standard, to be determined by looking at the totality of the circumstances. United States v. Cortez, 449 U.S.

411, 417-18 (1981); Ornelas, 517 U.S. at 696; State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). The Supreme Court has stated that

> [a]rticulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

Ornelas, 517 U.S. at 695 (quoting Illinois v. Gates, 462 U.S. 213, 132 (1983)). Relevant factors to consider include the officer's personal observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. Simpson, 968 S.W.2d at 783; Watkins, 827 S.W.2d at 294; Cortez, 449 U.S. at 418. A court must also consider the rational inferences and deductions that a trained officer may draw from the facts and circumstances known to him. Id.

In this case, the seizure of the Defendant's car was based entirely on Trooper Norrod's personal observations. Trooper Norrod testified that the Defendant passed another vehicle on Interstate 40 without signaling before changing lanes to pass or before returning to the right-hand lane, and that the Defendant was driving on the white line after returning to the right-hand lane of traffic. Trooper Norrod could not say that the Defendant created a hazard by changing lanes without signaling or by driving on the white line. On the videotape of the encounter between Officer Norrod and the Defendant, Officer Norrod tells the Defendant that he "did not know if [the Defendant] was drunk or sleepy." The videotape briefly shows the Defendant's car driving down the road with no other vehicles in the near vicinity. Thus, on the basis of these facts, we must determine whether there was either probable cause or reasonable suspicion to justify the seizure of the Defendant's vehicle.

As previously stated, if an officer has probable cause to believe that a violation of the traffic code has occurred, the seizure will be upheld even if the stop is a complete pretext for the officer's subjective motivations in making the

stop. <u>Wren,</u> 517 U.S. at 814-17; <u>Vineyard,</u> 958 S.W.2d at 734-35. The State asserts that the Defendant made an "improper" lane change because he did not signal, yet we can find no authority for the proposition that failing to give a signal under the facts of this case constitutes a violation of the traffic code. The relevant provision of the traffic code is as follows:

> **Turning movements. --** (a) No person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in § 55-8-140, or turn a vehicle to enter a private road or driveway, <u>or otherwise turn a vehicle from a direct course or move right or left upon a roadway</u>, unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate signal in the manner provided in §§ 55-8-143 and 55-8-144 <u>in the event any other traffic may be affected by such movement</u>.

Tenn. Code Ann. § 55-8-142 (emphasis added). Very similarly, another provision provides:

> Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that such movement can be made in safety, and <u>whenever the operation of any other vehicle may be affected by such movement</u>, shall give a signal required in this section, plainly visible to the driver of such other vehicle of the intention to make such movement.

Tenn. Code Ann. § 55-8-143(a) (emphasis added). Thus, the only time a driver must signal before changing lanes appears to be when that change will affect other vehicles.

Here, the Defendant changed lanes to pass another vehicle on a four-lane divided highway without first giving a signal. We do not believe this is an unusual occurrence. There was no evidence that any other vehicles, other than the Defendant's vehicle and the vehicle the Defendant passed, were in the near vicinity. This was certainly not a situation in which the Defendant was changing lanes during rush hour or other time of high traffic flow, where almost every movement of every vehicle will likely affect the travel of other vehicles on the road. The vehicle the Defendant passed was traveling in the right-hand lane of traffic, with the Defendant behind it. When the Defendant moved into the left-hand lane, his lane change would not have affected the forward travel of the other

car. Similarly, when the Defendant changed back into the right-hand lane, he was in front of the other vehicle, so his lane change would not have affected the movement of that car. That car would not have had to slow down, speed up, or in any way alter its course due to the Defendant's lane change. Therefore, the Defendant did not violate any provision of the traffic code by failing to signal, and Trooper Norrod, by reason of his observations, did not have probable cause to believe that the Defendant violated a provision of the traffic code.

Similarly, Trooper Norrod did not have reasonable suspicion to believe that the Defendant was involved in or about to be involved in criminal activity, which would have also justified the seizure. He apparently suggested to the Defendant that he thought the Defendant might have been drunk or tired, but he insisted in the suppression hearing that the only reason he stopped the Defendant was because of an "improper" lane change. As already noted, the Defendant did not violate any traffic provision by changing lanes without signaling. Making a "lawful" lane change, which we equate somewhat to a "proper" lane change, as described herein, could not give any officer reasonable suspicion to believe that an individual is either drunk or tired. However, Trooper Norrod also testified that the Defendant was driving on the white line after he returned to the right-hand lane of traffic. Thus, we must determine whether driving on the white line after making a lane change is a sufficient fact to warrant reasonable suspicion that a driver is either drunk or tired.

We have previously considered the issue of reasonable suspicion in a number of cases. For example, in State v. Carl Seaward Allen, C.C.A. No. 01C01-9707-CC-00272, 1998 WL 458177 (Tenn. Crim. App., Nashville, Aug. 7, 1998), a case involving this same police officer, Trooper Norrod testified that he observed a vehicle change from the right to the left lane for no apparent reason and then move back over into the right lane and cross the white line twice. He turned on the video camera and recorded the vehicle twice veer over to the

extreme right-hand side of the road across the white line. It was almost midnight, and Trooper Norrod noticed that the vehicle bore Texas license plates. He said that he thought the driver was either drowsy or under the influence of an intoxicant. This Court upheld the seizure, concluding that "given the time of night, crossing the fog line three times, and the distance from which the vehicle had come, Officer Norrod had cause to stop Appellee's vehicle." Id. at *3. In State v. George Wesley Harville, C.C.A. No. 01-C-01-9607-CC-0030, 1997 WL 661726 (Tenn. Crim. App., Nashville, Oct. 24, 1997), we found the presence of reasonable suspicion when the officer observed a vehicle make a wide right turn which resulted in the vehicle crossing the center line into the opposing lane of traffic, causing another vehicle in the opposing lane to honk its horn. The vehicle then began weaving within its lane of traffic and was "riding" the center line at times. In State v. Randall L. McFarlin, C.C.A. No. 01C01-9406-PB-00202, 1995 WL 353776 (Tenn. Crim. App. June 13, 1995), we found reasonable suspicion when a vehicle was observed weaving back and forth from one lane to the other and across the center line of a highway and hitting a curb while making a sharp right turn. Recently, we found reasonable suspicion when a vehicle was weaving within its own lane of traffic, approaching the dividing line a number of times, and touching the center line at least twice. State v. Guy Binette, C.C.A. No. 03C01-9802-CR-00075, 1999 WL 427606 (Tenn. Crim. App., Knoxville, June 28, 1999).

In all of these cases, there was evidence of some type of erratic driving or weaving while driving, which could certainly be indicators of possible intoxication. The only evidence here is that the Defendant drove on the white line after returning to the right lane of traffic. There was no evidence that the Defendant moved out of his lane. There was no evidence that the Defendant was driving erratically, weaving, or otherwise causing a hazard to other vehicles. Trooper Norrod specifically stated at the suppression hearing that he stopped the Defendant for an improper lane change and for no other reason, indicating that he did not necessarily conclude the driving on the white line was of particular

significance. Driving on the white line might warrant an officer in further observation of a vehicle, but standing alone, it is not a sufficient and articulable fact to warrant the finding of reasonable suspicion to stop an automobile. We are reluctant to conclude that a person driving in a manner that an officer deems "improper," when the driving is not erratic or haphazard and does not create a dangerous situation, is subject to seizure while proceeding along a highway in a lawful manner. Only the hypothetical "perfect driver" would not be subject to seizure if we were to hold that minor driving "errors," which neither violate our traffic code nor create a hazard, indicate that a person might be intoxicated. We are not willing to ignore the guarantees of the Fourth Amendment and indirectly hold that "[t]he word 'automobile' is . . . a talisman in whose presence the Fourth Amendment fades away and disappears." See Coolidge v. New Hampshire, 403 U.S. 443, 461-62 (1971). Accordingly, we must reverse the order of the trial court overruling the motion to suppress, vacate the Defendant's convictions, and remand the case to the trial court for dismissal of the charges.

_____
DAVID H. WELLES, JUDGE


CONCUR:


_____
JOHN H. PEAY, JUDGE


_____
JOHN EVERETT WILLIAMS, JUDGE