# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 20, 2010 Session

## STATE OF TENNESSEE v. ANTOINETTE FEASTER

**Appeal from the Circuit Court for Rutherford County**
**No. F-61591A      Don Ash, Judge**

---

**No. M2009-01284-CCA-R3-CD - Filed July 21, 2010**

---

The Defendant, Antoinette Feaster, was convicted of one count of possession with intent to deliver over twenty-six grams of cocaine, a Class B felony. See Tenn. Code Ann. § 39-17-417(i)(5). She was sentenced, as a Range I, standard offender, to eight years in the Department of Correction. In this direct appeal, she contends that: (1) the trial court erred in denying her motion to suppress the cocaine underlying her conviction; (2) the trial court erred in allowing a witness, who was not listed on the Defendant's indictment or in discovery material, to testify; (3) the trial court erred in failing to require the State to elect a single offense to be presented to the jury; (4) the State presented evidence insufficient to convict her; (5) the trial court erred in charging the jury; (6) the trial court erred in declining to allow the jury to consider the search at issue in this case; and (7) the trial court erred in denying the Defendant a community corrections sentence. After our review, we conclude that the trial court erred in denying the Defendant's motion to suppress due to an unlawful initial stop. We accordingly reverse and remand this case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Antoinette Feaster.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William Whitesell, District Attorney General; and Jude Santana, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual Background

Testimony in this case was heard at a December 15, 2008 hearing on the Defendant's motion to suppress and at the Defendant's trial on January 15 and 16, 2008. The Defendant was tried jointly with her co-defendant, Katrina Harper.

At the suppression hearing, Officer Travis Robinson of the Rutherford County Sheriff's Department ("RCSD") testified that, on August 15, 2007, he was sitting in his police car in the Interstate 24 median, near the eighty-ninth mile marker. While observing Interstate 24 eastbound, he noticed the Defendant's vehicle "traveling approximately 8 to 10 miles below the speed limit in the fast lane." He then observed the Defendant's vehicle move, without signaling, from the left lane to the right lane. Officer Robinson said there was a "[m]edium amount of traffic for the interstate that day. Vehicles around [the Defendant's vehicle]." On cross-examination, defense counsel and Officer Robinson had the following exchange:

> [Defense Counsel]: Okay. And did you see any vehicle put on the brakes as a result of this lane change?
>
> [Officer Robinson]: There were several vehicles around. I can't recall at this time.
>
> [Defense Counsel]: Did you see any vehicle having to leave the road as a result of this lane change?
>
> [Officer Robinson]: I don't recall any vehicles leaving the road, no, sir.

Officer Robinson began to follow the vehicle. He activated his vehicle's blue lights and pulled the Defendant over at about the ninety-first mile marker. According to the video recording that began when Officer Robinson activated his blue lights, this stop occurred at 10:53 a.m.

Officer Robinson approached the vehicle and began to converse with the Defendant, who sat in the driver's seat. The Defendant said that she did not have her driver's license. Officer Robinson asked her to exit the vehicle; she did so, and Officer Robinson attempted to collect identifying information from the Defendant while writing her a ticket for "improper passing." Officer Robinson marked the ticket as being written at 10:58 a.m.; at the

suppression hearing, he guessed that he would have marked the time as he began to write the ticket.

Officer Robinson asked the Defendant for consent to search her vehicle. She refused consent. Between 11:05 and 11:13 a.m., Officer Robinson radioed for a K-9 unit. The unit arrived shortly thereafter, while Officer Robinson was still working to confirm the Defendant's identity. Officer Robinson eventually confirmed the Defendant's identity, as she was able to give him her driver's license number.

The K-9 unit's drug dog "alerted" outside the Defendant's vehicle, leading Officer Robinson and the other officers who had joined him to believe that there were drugs therein. The officers searched the vehicle, finding what the Tennessee Bureau of Investigation ("TBI") later determined to be about 130 grams of cocaine in a jewelry box under the front passenger seat. Officer Robinson arrested the Defendant and Ms. Harper. Officer Robinson eventually found the Defendant's driver's license while searching her vehicle incident to arrest.

Sergeant Chris Haynes testified that, at that time, he worked as the supervisor of the RCSD's K-9 team. On August 15, 2007, he received a call directing him and his drug dog, Dawi, to the location where Officer Robinson had stopped the Defendant. Sergeant Haynes arrived on the scene between two and three minutes after receiving the call. At trial, he summarized the extensive narcotics detection training Dawi had received and noted that he had worked with Dawi for eight years.

Sergeant Haynes twice walked Dawi around the Defendant's vehicle. Dawi normally sat down upon detecting drug odor; on the first time around the vehicle, however, Dawi stopped at the front passenger-side door but did not sit down. Sergeant Haynes believed Dawi did not sit down because the ground was hot. He walked Dawi around the car again. Dawi stopped and smelled the air near the back driver-side door, but again did not sit down. Upon reaching the front passenger-side door a second time, Dawi sat down. Sergeant Haynes told Officer Robinson that Dawi had detected drug odor.

On cross-examination, the Defendant introduced records documenting incidents in which Dawi had alerted when no drugs were found to be present. Sergeant Haynes explained that Dawi reacted to drug odor, not necessarily the presence of drugs, as drug odor might remain in an area after drugs have been removed. He also testified that he had worked with Dawi for a number of years and that he had found contraband due to Dawi's alerts on hundreds of occasions.

The trial court denied the Defendant's motion to suppress the cocaine found in her vehicle.

At trial, the State again presented the testimony of Officer Robinson and played the video recording begun when he activated his blue lights. He testified that he stopped the Defendant's Chevrolet Tahoe, determined that she had no driver's license, and asked her to step out of her vehicle. For safety purposes, he then spoke to her on the right side of the vehicle, away from traffic. During the search of the vehicle, RCSD Officer Scott Tillman found two bags of cocaine in a box under the front passenger seat. Officer Robinson took custody of the cocaine, depositing it into the RCSD's secure evidence locker following the Defendant's arrest. Sergeant Haynes also testified, describing Dawi's detection of drug odor and clarifying that he, Officer Robinson, and Officer Tillman conducted the search of the Defendant's vehicle. Sergeant Haynes noted that Officer Tillman found "[a] substantial amount of cocaine."

RCSD Officer Philip Martin testified that Officer Robinson sealed the recovered cocaine and logged it into evidence. Officer Martin later transported it to the Tennessee Bureau of Investigation ("TBI") for testing. He brought it back from the TBI when testing had been completed and secured it again in the RCSD evidence locker. Finally, Officer Martin brought the cocaine to court for the Defendant's trial. On cross-examination, Officer Martin noted that no one requested that the cocaine or its container be analyzed for fingerprints.

TBI Special Agent Harry Woods, at the time a member of the TBI's evidence receiving unit, testified that he handled the submission of the cocaine found in the Defendant's vehicle. TBI Special Agent and forensic scientist Cassandra Beavers was qualified as an expert in narcotics testing. She testified that she tested the substances at issue in this case; the first bag contained 12.9 grams of crack cocaine, and the second bag contained 122.5 grams of powder cocaine. Agent Beavers showed both bags to the jury.

Officer Tillman, called to testify as a rebuttal witness at the end of the State's case, corroborated his colleagues' testimony. He noted that he found a "wooden antique-like box" under the Defendant's vehicle's front passenger seat containing two packages of a white substance that he believed to be cocaine. He gave the packages to Officer Robinson. He played no further role in this case, and did not know to whom the cocaine belonged.

The Defendant chose not to testify. Her co-defendant, Katrina Harper, testified in her own defense, however. She said that she had known nothing about the cocaine under her seat in the Defendant's vehicle and had been surprised when the police found it. On cross-

examination, Ms. Harper said that two days before the traffic stop at issue she and the Defendant had taken a trip from Etowah, where Ms. Harper lived with her grandmother, to the Defendant's apartment in Nashville. They had left Nashville at about 9:00 a.m. on August 15, 2007, intending to return to Etowah.

The Defendant was convicted of one count of possession with intent to deliver over twenty-six grams of cocaine.[1] She now appeals.

**Analysis**

**I. Motion to Suppress**

The Defendant contends that the trial court erred, for a number of reasons, in denying her motion to suppress the evidence recovered from her vehicle. "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's applications of law to fact de novo, however. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from such evidence." Odom, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

**A. Initial Seizure**

The Defendant first contends that the trial court erred in holding that Officer Robinson had reasonable suspicion to believe she committed a traffic violation. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, article I, section 7 of the Tennessee Constitution guarantees

> that the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby

---

[1]Ms. Harper was also so convicted.

an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

The intent and purpose of the prohibition against unreasonable searches and seizures found in the Tennessee Constitution has been found to be the same as that found in the Fourth Amendment to the United States Constitution. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998) (citing State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997); Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). According to the Supreme Court, the purpose of the prohibition against unreasonable searches and seizures in the Fourth Amendment is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." Camara v. Municipal Court, 387 U.S. 523, 528 (1967). The Fourth Amendment protects people, not places, wherever they may have a "reasonable expectation of privacy." Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

Under both the United States and Tennessee Constitutions, a search or seizure conducted without a warrant is presumed unreasonable. Coolidge v. New Hampshire, 403 U.S. 443 (1971); Simpson, 968 S.W.2d at 780; State v. Watkins, 827 S.W.2d 293, 295 (Tenn. 1992). Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless that search or seizure was conducted pursuant to one of the recognized exceptions to the warrant requirement. Coolidge, 403 U.S. at 478.

The stop of an automobile and the detention of its occupants constitutes a seizure, even if the purpose of the stop is limited and the detention is brief. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Martinez Fuerte, 428 U.S. 543, 556-58 (1976); State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997). A police officer may stop or "seize" an automobile if the officer has probable cause to believe that a criminal offense has occurred or that a traffic violation has occurred. Whren, 517 U.S. at 810; Prouse, 440 U.S. at 655, 659; Vineyard, 958 S.W.2d at 734. If the officer has probable cause to believe that a violation of the traffic code has occurred, the seizure will be upheld even if the stop is a complete pretext for the officer's subjective motivations in making the stop. Whren, 517 U.S. at 813-17; Vineyard, 958 S.W.2d at 734-35.

Officer Robinson initially stopped the Defendant's vehicle based on his belief that the Defendant had violated Tennessee Code Annotated section 55-8-143(a), which states that:

Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that that movement can be made in safety, and whenever the

operation of any other vehicle may be affected by such movement, shall give a signal required in this section, plainly visible to the driver of the other vehicle of the intention to make such movement.

We previously considered the requirements of section 55-8-143(a) in State v. Smith, 21 S.W.3d 251 (Tenn. Crim. App. 1999). A state trooper traveling on Interstate 40 eastbound saw the Smith defendant move his vehicle from the interstate's right lane to its left lane, pass a vehicle still occupying the right lane, and return to the right lane. The defendant did not signal either lane change. Id. at 252. On this basis, the trooper stopped the defendant. Id. The trooper "did not say that the [d]efendant's vehicle created any type of hazard or that it almost caused an accident by changing lanes without signaling. He could not remember the other vehicle applying brakes or taking any sort of evasive action due to the [d]efendant's vehicle passing it without signaling." Id.

We held that the Smith defendant had not violated section 55-8-143(a), noting that

[t]his was certainly not a situation in which the Defendant was changing lanes during rush hour or other time of high traffic flow, where almost every movement of every vehicle will likely affect the travel of other vehicles on the road. The vehicle the Defendant passed was traveling in the right-hand lane of traffic, with the Defendant behind it. When the Defendant moved into the left-hand lane, his lane change would not have affected the forward travel of the other car. Similarly, when the Defendant changed back into the right-hand lane, he was in front of the other vehicle, so his lane change would not have affected the movement of that car.

Id. at 257.

We similarly held that the defendant in State v. Gonzalez, 52 S.W.3d 90 (Tenn. Crim. App. 2000), had not violated section 55-8-143(a). In that case, however, the defendant failed to signal a right turn from one street onto another in an area in which no other vehicle was present but that of a police officer following him. Id. at 93. That officer testified that the defendant's turn "would not have affected his police vehicle." Id.

In State v. William Lee Collins, No. E2007-00531-CCA-R3-CD, 2007 WL 2792929 (Tenn. Crim. App., Knoxville, Sep. 27, 2007), a police officer observed a truck pulling a trailer "drive 'between the two vehicles' that were in the left and right lanes of the four-lane divided highway without signaling to the other drivers." Id. at *3. Testimony established that the defendant, the driver, had "conducted [this] lane change in 'close proximity' to the

other vehicles." Id. We held that this evidence supported a violation of section 55-8-143(a) in that it "show[ed] that the [d]efendant's behavior affected other drivers." Id.

In this case, Officer Robinson testified that there was a "medium amount of traffic" on the interstate and that the Defendant's vehicle had other "vehicles around it." He could not recall any nearby vehicle using its brakes or leaving the interstate as a result of the Defendant's lane change. We conclude that this testimony is insufficient to support a violation of section 55-8-143(a). As in Smith, it establishes only that other drivers were present somewhere in the Defendant's vicinity. See Smith, 21 S.W.3d at 257. It does not establish that the Defendant maneuvered her vehicle in "close proximity" to other vehicles such that those vehicles may have been affected by her lane change. Collins, 2007 WL 2792929 at *3.

We are mindful of the fact that section 55-8-143(a) does not require evidence that other vehicles actually were affected by a defendant's turn or lane change; our precedents have considered such evidence important only because the fact of an actual effect on another vehicle necessarily establishes the possibility of that effect. Like the United States District Court for the Middle District of Tennessee, however, we are "not persuaded . . . that all vehicles within the vicinity of a vehicle changing lanes on the interstate may be affected by that vehicle's lane change." United States v. Olson, 59 F. Supp. 2d 725, 729 (M.D. Tenn. 1999).

To be sure, we can easily imagine a scenario in which a vehicle, traveling in a medium amount of traffic with other vehicles around it, changes lanes in a way that may affect other vehicles. This case simply lacks specific evidence that such an event actually occurred. In order to establish a violation of section 55-8-143(a), the evidence must show that a vehicle turned or changed lanes without signaling and that this failure to signal at least threatened to create a hazard involving other vehicles.

In our view, the officer did not have the requisite probable cause to stop the Defendant's vehicle. We accordingly reverse the trial court's denial of the Defendant's motion to suppress. In order to facilitate possible further appellate review, however, we will consider the remainder of the Defendant's issues while assuming for the purpose of argument that the Defendant did violate section 55-8-143(a).

### B. Length of Detention
The Defendant next contends that Officer Robinson detained her for an unreasonable amount of time and that she should have been released with a citation before the arrival of the RCSD's K-9 unit.

Again, we are analyzing this issue on the assumption that Officer Robinson's initial detention of the Defendant was lawful. A detention can lose its lawful character if it extends beyond the time reasonably necessary to effect its initial purpose. A police officer's actions after conducting an investigatory stop must reasonably relate to the circumstances which justified the stop in the first place. Terry v. Ohio, 392 U.S. 1, 20 (1968). The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). "If the time, manner or scope of the investigation exceeds the proper parameters," a constitutionally permissible stop may be transformed into an impermissible stop. State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002). "[A]n otherwise lawful canine sweep that is ancillary to a legitimate traffic stop may constitute an unlawful search if the suspect is detained beyond the time necessary to complete the traffic stop." State v. Melvin Jerome Reed, Jr., No. M2008-01850-CCA-R3-CD, 2009 WL 2991548, at *7 (Tenn. Crim. App., Nashville, Sep. 17, 2009) (citing United States v. Place, 462 U.S. 696, 709 (1983); Troxell, 78 S.W.3d at 871)).

### i. Completion of Citation

The Defendant initially argues that her warning citation was complete and could have been issued before she declined Officer Robinson's search request. The Defendant contends that her detention became unreasonable when Officer Robinson chose to verify her identity and driver's license rather than releasing her. Our supreme court has noted, however, that "[a]fter a traffic violation, a driver can generally expect 'to spend a short period of time answering questions and waiting while the officer checks his license and registration.'" State v. Berrios, 235 S.W.3d 99, 107 (Tenn. 2007). This Court has held that "requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Gonzalo Moran Garcia, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *21 (Tenn. Crim. App., Nashville, Feb. 20, 2002) (citing United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998)), overruled on other grounds by State v. Garcia, 123 S.W.3d 335 (Tenn. 2003).

### ii. Cite and Release

The Defendant next contends that Officer Robinson violated her statutory right to be cited and released when he took steps to verify her identity and asked to search her vehicle. While the Defendant is correct that misdemeanants have a "presumptive right to be cited and released" under Tennessee Code Annotated section 40-7-118(b)(1), that statue only requires a cite and release "in lieu of effecting a custodial arrest" for the misdemeanor at issue. State v. Walker, 12 S.W.3d 460, 464 (Tenn. 2000). It does not require police to avoid taking any action other than the issuance of a citation. "[W]hile the cite and release statute dictates the

-9-

situations under which an offender must be cited instead of arrested, by its terms, it does not dictate or limit the scope of an officer's investigation." Reed, 2009 WL 2991548, at *8.

The Defendant relies heavily on State v. Morelock, in which we suggested that an officer should have "obtained [the defendant's] signature on the citation and sent him on his way" in lieu of extending the defendant's detention for the purpose of asking for permission to search. 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992). By the time the Morelock citation was complete, however, no question remained regarding the validity of the Morelock defendant's Georgia driver's license. Id. at 839. This case is distinguishable; Officer Robinson completed the Defendant's citation before he had verified her identity and driver's license, two legitimate reasons for brief additional detention.

### iii. K-9 Unit Delay

The Defendant also contends that Officer Robinson intentionally prolonged the Defendant's detention in order to allow a K-9 unit time to arrive. We have reviewed the video of the traffic stop at issue in this case. According to the clock within the police vehicle camera, Officer Robinson stopped the Defendant at about 10:53 a.m. At about 10:55, the Defendant told Officer Robinson that she did not have her driver's license. The Defendant gave Officer Robinson her driver's license number at about 10:58:15; the two conversed uneventfully until 11:01:30, at which time Officer Robinson asked the Defendant for permission to search her vehicle. The Defendant declined. Officer Robinson then entered his vehicle and, at about 11:02:45, requested a K-9 unit over the radio. At about 11:04, he radioed the Defendant's driver's license number for verification. Sergeant Haynes and Dawi arrived at about 11:05:45. Officer Robinson received verification of the Defendant's driver's license number and personal details from about 11:06:15 to about 11:06:45. Sergeant Haynes and Dawi completed their second pass around the Defendant's vehicle at about 11:06:50.

The K-9 unit therefore arrived about three minutes after being called. Officer Robinson finished verifying the Defendant's identity and driver's license number about two minutes and forty-five seconds after submitting it. In order to avoid any delay, Officer Robinson could have simultaneously begun to verify the Defendant's identity and requested a K-9 unit. Had he done so, however, it appears that the Defendant's identity information and the K-9 unit would still have arrived at approximately the same time. Under all of the circumstances, we conclude that Officer Robinson's detention of the Defendant was reasonable.

### C. Miranda

The Defendant next contends that Officer Robinson should have informed her of her rights under Miranda v. Arizona, 384 U.S. 436 (1966), before questioning her at the site of the traffic stop. Police officers are only obligated to administer Miranda warnings prior to

"custodial interrogation." See Miranda, 384 U.S. at 444. Whether a person is in custody requires an inquiry into "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996).

The United States Supreme Court, despite its recognition that "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle" and "constitutes a 'seizure,' " Berkemer v. McCarty, 468 U.S. 420, 436-37, (1984) (citations omitted), has held that "persons temporarily detained pursuant to such [traffic] stops are not 'in custody' for the purposes of Miranda." Id. at 440. In so holding, the Court noted that "two features of an ordinary traffic stop mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" Id. at 437. (quoting Miranda, 384 U.S. at 467). "First, detention of a motorist pursuant to a traffic stop is presumptively temporary and brief." Id. "Second, circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." Id. at 438. The Court strongly contrasted this type of police-citizen interaction with the often lengthy, "police dominated" questioning occurring in the type of stationhouse interrogation at issue in Miranda. Id. at 437-39.

The Defendant argues that Miranda warnings were required because Officer Robinson directed her to stand in front of his police vehicle and intermittently questioned her for seven minutes. These actions are entirely typical of a traffic stop in which an officer is attempting to confirm a driver's identity, and certainly do not establish "deprivation of freedom of movement to a degree associated with a formal arrest." Anderson, 937 S.W.2d at 855. This issue is without merit.

### E. Reliability of K-9 Unit
The Defendant next contends that the trial court erred in finding that Sgt. Haynes' drug dog, Dawi, was reliable. Dawi was not reliable, the Defendant argues, because some of Dawi's prior alerts had not resulted in drug discoveries, Dawi did not actually alert on her vehicle, and Sgt. Haynes inappropriately cued Dawi.

Our supreme court has held "that the finding of probable cause should turn on the reliability of the canine and that the trial court should ensure that the canine is reliable by an appropriate finding of fact." State v. England, 19 S.W.3d 762, 768 (Tenn. 2000). "'Reliability problems arise when the dog receives poor training, has an inconsistent record, searches for narcotics in conditions without reliability controls or receives cues from its handler.'" Id. (quoting U.S. v. $80,460.00 in U.S. Currency, 781 F. Supp. 462, 478 (N.D. Tex. 1991).

> [T]he trial court, in making the reliability determination, may consider such factors as: the canine's training and the canine's "track record," with emphasis on the amount of false negatives and false positives the dog has furnished. The trial court should also consider the officer's training and experience with this particular canine.

Id. (citations omitted).

As previously noted, Sgt. Haynes testified regarding Dawi's extensive training in drug detection. Acknowledging the occasions on which Dawi had alerted and drugs were not found, Sgt. Haynes testified that Dawi had correctly alerted "hundreds" of times and that Dawi responded to drug odor, not necessarily the presence of drugs. The evidence does not preponderate against the trial court's finding that Dawi was reliable.

The Defendant also argues that Dawi simply did not alert on her vehicle; Sgt. Haynes testified, however, that Dawi alerted by sitting down. The video clearly shows Dawi stop and sit down near the back of the front passenger-side door on Sgt. Haynes' second pass around the Defendant's vehicle. The Defendant has failed to demonstrate that the evidence preponderates against the trial court's finding that Dawi alerted on her vehicle.

The video in evidence in this case shows Sgt. Haynes pointing at various areas of the Defendant's vehicle while walking Dawi. Sergeant Haynes testified that this pointing directed Dawi to search particular areas. The Defendant argues that this pointing constituted inappropriate cuing from Sgt. Haynes. The Defendant presented no evidence in support of this assertion, however. Again, the evidence does not preponderate against the trial court's findings. This issue is without merit.

## II. Officer Tillman's Rebuttal Testimony

The Defendant next contends that the trial court erred in allowing Officer Tillman to testify because he was not included on the State's witness list or in any discovery material as required by Tennessee Code Annotated section 40-17-106. "Evidence should not be excluded except when the defendant is actually prejudiced by the failure to comply with the rule and when the prejudice cannot otherwise be eradicated." State v. Wilson, 164 S.W.3d 355, 362 (Tenn. Crim. App. 2003). "'In this context, it is not the prejudice which resulted from the witnesses testimony but the prejudice which resulted from the defendant's lack of notice which is relevant.'" Id. (quoting State v. Jesse Eugene Harris, No. 88-188-III, 1989 WL 60393, at *8 (Tenn. Crim. App., Nashville, June 7, 1989)).

The Defendant claims she was prejudiced by the State's failure to identify Tillman because she "could have investigated Tillman's role more thoroughly." Officer Tillman,

however, testified briefly and established that he had located the cocaine in the Defendant's vehicle. The Defendant has not demonstrated what information Officer Tillman's exclusion from the State's witness list prevented her from discovering. Moreover, the State correctly notes on appeal that Officer Tillman appears on the video in evidence in this case and can be seen removing a box from the front passenger-side area of the vehicle. This issue is without merit.

## III. Election of Offenses

The Defendant was charged with one count of possession of a controlled substance with intent to manufacture, deliver, or sell that substance. See Tenn. Code Ann. § 39-17-417(a)(4). After all proof had been presented, the State conceded that it had offered no proof of the Defendant's intent to manufacture. The trial court instructed the jury on possession with intent to sell and possession with intent to deliver. The Defendant next contends that the trial court erred by failing to require the State to choose whether to instruct the jury on possession with intent to sell or possession with intent to deliver.

The constitutional right to a jury trial under Tennessee law "necessarily includes the right to a unanimous jury verdict before a conviction of a criminal offense may be imposed." State v. Lemacks, 996 S.W.2d 166, 169-170 (Tenn. 1999) (citations omitted). We note that the trial court's instructions to the jury are not contained in the record on appeal. The verdict form specifies that the jury unanimously found the Defendant guilty of possession with intent to deliver between twenty-six and 299.9 grams of cocaine. The Defendant is not entitled to relief on this issue.

## IV. Sufficiency of the Evidence

The Defendant next contends that the State presented evidence insufficient to convict her of possession with intent to deliver over twenty-six grams of cocaine. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

### A. Possession

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell the controlled substance." Tenn. Code Ann. § 39-17-417(a)(4). A defendant may actually or constructively possess a controlled substance. "The [S]tate may establish constructive possession by demonstrating that the defendant has the power and intention to exercise dominion and control over the controlled substance either directly or through others . . . . In essence, constructive possession is the ability to reduce an object to actual possession." State v. Brown, 915 S.W.2d 3, 7 (Tenn. Crim. App.1995) (internal citation omitted). Regarding the Defendant's possession of the cocaine at issue in this case, we have held "that a defendant's possession of contraband may be inferred from a defendant's ownership or control over a vehicle in which the contraband is secreted." State v. James A. Jackson, No. M1998-00035-CCA-R3-CD, 2000 WL 549295, at *11 (Tenn. Crim. App., Nashville, May 5, 2000); see also State v. Ross, 49 S.W.3d 833, 846 (Tenn. 2001). The evidence established that the Defendant owned the vehicle in which the cocaine was found. The Defendant was present in the vehicle at the time it was found. We therefore conclude that the State presented evidence sufficient to establish that the Defendant possessed the contraband at issue.

### B. Intent to Deliver

The Defendant next contends that the State did not present evidence sufficient to establish that she intended to deliver the cocaine and crack cocaine found in her vehicle. Tennessee Code Annotated section 39-17-419 establishes that "[i]t may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." The Defendant was found with a total of 135.4 grams of cocaine, most of which was present in powder cocaine form. The jury was able to view the cocaine, and heard testimony from Sergeant Haynes that it was a "substantial amount." We conclude this evidence of quantity is sufficient, under section 39-17-419, to support the inference that the Defendant intended to deliver the cocaine at

issue rather than retain it for her personal use. See, e.g., State v. Jerry Blaylock, No. 02C01-9602-CC-00069, 1997 WL 475163, at *4 (Tenn. Crim. App., Jackson, Aug. 21, 1997) (holding that evidence of possession of 6.2 grams of crack cocaine, an amount about sixty-two times greater than the average quantity tested by the case's toxicologist, was sufficient to demonstrate intent to deliver). This issue is without merit.

## V. Jury Charge

The Defendant next contends that the trial court erred in instructing the jury that all witnesses are presumed to be truthful. Before the jury was charged, defense counsel objected to any instruction "that all witnesses are truthful," arguing that such an instruction improperly commented on the Defendant's decision not to testify. The trial court responded, "I'll take a look at it."

We cannot review this issue because the Defendant has failed to include the actual jury instructions in the record. "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993) (citation omitted). This issue is therefore waived.

## VI. Jury Consideration of Search Issues

During its deliberations, the jury submitted the following question to the trial court: "What is the law in Tennessee concerning search and seizure during a traffic stop?" The trial court proposed to respond that "the law in Tennessee in regard to search and seizure is not relevant to this case . . . I could say I've already ruled on that." The State agreed. Defense counsel asked "the [trial court] to say that that is not for the jury's consideration, that subject matter is not for the jury's consideration." The trial court responded, "Okay, I'll do that," and instructed the jury that "that subject matter is not for your consideration in this case. You have to go on what the law is as I gave it to you. That's what you apply here. You're not to consider this."

The Defendant now contends that the trial court erred in declining to instruct the jury on search and seizure law. She attempts to analogize her case to Crane v. Kentucky, 476 U.S. 683 (1986). The lower court in Crane held, in a pretrial ruling, that the Crane defendant's confession had been voluntary. Id. at 684. It then foreclosed the defendant from presenting any evidence regarding the circumstances of that confession. Id. The defendant wished to present such testimony not for the purpose of renewing his challenge to the voluntariness of his confession, but for the purpose of attacking the admittedly voluntary confession's credibility. Id. at 687. The United States Supreme Court reversed, holding that

"evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility." Id. at 691.

In this case, the Defendant could only have desired to have the jury instructed on Tennessee's search and seizure law in order for the jury to decide the case based, at least in part, on the same legal issues previous determined at his suppression hearing. This case is thus not analogous to Crane.

The Defendant, further, did not unsuccessfully attempt to present additional evidence regarding the RCSD's search and seizure procedures at trial, nor did he object to the trial court's answer to the jury's question regarding those procedures. He has therefore waived this issue even if the trial court had erred. See Tenn R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

## VII. Denial of Community Corrections

The Defendant next argues that the trial court abused its discretion by not allowing her to serve her sentence in community corrections. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses;

and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

The principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. See Tenn. Code Ann. § 40-35-103(2), (4). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. See Tenn. Code Ann. § 40-35-103(5).

The presentence report in this case indicates that, at the time of sentencing, the Defendant was thirty-six years old. She was married but separated from her husband. The Defendant reported that her most recent employment had been as a self-employed house cleaner. She had one prior conviction, in 1994, for theft of property valued at up to $500. The Defendant reported that she attended Rule High School in Knoxville but dropped out during the eleventh grade. She earned a G.E.D. in 2003. She reported poor mental health, stating that she suffered from manic depression, schizophrenia, and bipolar disorder; she had been taking medications for these conditions but had been unable to obtain them for some time before being incarcerated. The Defendant reported fair physical health, noting that she suffered from arthritis in her back. She did not report drug or alcohol abuse.

The Defendant did not testify at her sentencing hearing; the court heard testimony only from Kelly Travis, a case officer with Mid Cumberland Community Corrections. Ms. Travis testified that she had reviewed the Defendant's records and determined that the Defendant was eligible for the Community Corrections Program. She also said that her program was equipped to manage the Defendant's reported schizophrenia and bipolar disorder. The trial court denied the Defendant a sentence of community corrections, instead ordering her to serve eight years in the Department of Correction.

The Community Corrections Act was meant to provide an alternative means of punishment for "selected, nonviolent felony offenders . . . , thereby reserving secure confinement facilities for violent felony offenders." Tenn. Code Ann. § 40-36-103(1); see also State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). Pursuant to statute, persons who satisfy all of the following minimum criteria are eligible for participation in a community corrections program:

(A) Persons who, without this option, would be incarcerated in a correctional institution;

-17-

(B) Persons who are convicted of property-related, or drug/alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; [and]

(F) Persons who do not demonstrate a pattern of committing violent offenses[.]

Tenn. Code Ann. § 40-36-106(a)(1).

Persons who do not otherwise satisfy the minimum criteria and who would usually be considered unfit for probation due to histories of chronic alcohol abuse, drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community may be considered eligible for participation in a community corrections program. Tenn. Code Ann. § 40-36-106(c).

The Defendant is not presumptively entitled to an alternative sentence because she was convicted of a Class B felony. See Tenn. Code Ann. § 40-35-102(6). Further, our review of the Defendant's sentencing hearing reflects that the trial court properly considered all relevant facts and circumstances as well as the principles of the Sentencing Act. See Pettus, 986 S.W.2d at 543-44. The trial court acknowledged the Defendant's eligibility for community corrections but chose, in its discretion, to sentence her to confinement. Under these circumstances, we conclude that the Defendant has not overcome the presumption of correctness to which the trial court is entitled. This issue is without merit.

### Conclusion

Based on the foregoing authorities and reasoning, we reverse the trial court's denial of the Defendant's motion to suppress. The Defendant's conviction is reversed, and this case is remanded to the trial court for further proceedings consistent with this opinion.

_____
DAVID H. WELLES, JUDGE