# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 10, 2012 Session

## STATE OF TENNESSEE v. KEITH RICHARD GIBSON

**Direct Appeal from the Circuit Court for Obion County**
**No. CC-10-CR-21     William B. Acree, Jr., Judge**

---

**No. W2010-02367-CCA-R3-CD - Filed May 8, 2012**

---

Defendant-Appellant, Keith Richard Gibson, was convicted after a jury trial for possession of .5 grams or more of cocaine with intent to sell, a Class B felony, and simple possession of a controlled substance, a Class A misdemeanor. He was sentenced as a Range I, standard offender and received eight years' incarceration for the felony and eleven months and twenty-nine days' incarceration for the misdemeanor. He appeals the trial court's denial of his motions to suppress evidence, arguing that the police lacked reasonable suspicion to support the investigatory stop of the defendant as required by the Fourth Amendment of the United States Constitution and article 1, section 7 of the Tennessee Constitution. Upon review, although we reject a part of the trial court's reasoning in its denial of the motions to suppress, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

James B. Webb and Brandon L. Newman, Trenton, Tennessee for the Defendant-Appellant, Keith Richard Gibson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Thomas (Tommy) A. Thomas, District Attorney General; and Kevin D. McAlpin, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Gibson was charged with possession of .5 grams or more of cocaine with intent to sell, tampering with evidence, evading arrest, and simple possession of a controlled substance. These charges stemmed from an investigatory stop by Officer Derrick O'Dell

of the Union City Police Department. Gibson filed a motion to suppress and a renewed motion to suppress, in which he argued that the stop was not supported by reasonable suspicion. The trial court denied the motions after evidentiary hearings. Immediately before trial, the State entered a nolle prosequi regarding the charge of evading arrest. After the State's proof at trial, the court granted Gibson's motion for judgment of acquittal regarding the charge of tampering with evidence. The jury subsequently found Gibson guilty of possession with intent to sell and simple possession. Gibson now appeals the trial court's denial of his motions to suppress.

**Suppression Hearings.** Officer O'Dell testified that prior to Gibson's arrest, Jerry Steel and Stephanie Bledsoe provided him with "tips" regarding Gibson. Six months before Gibson's arrest, Steel told Officer O'Dell that he had purchased drugs from Gibson in the past. Officer O'Dell said that Steel had previously provided information to him and that Steel "has proven to be a reliable informant." According to O'Dell, Steel gave O'Dell information that led to the seizure of half a pound of methamphetamine and an associated arrest in 2007 or 2008. He also gave O'Dell information that led to the recovery of property that Steel himself had stolen. Officer O'Dell said that he had previously arrested Steel for drug offenses several times. One week before Gibson was arrested, Bledsoe, a cousin of Gibson's girlfriend, told Officer O'Dell that "any time that [Gibson]'s in town . . . he has . . . hard and that he stores it in his crotch." Officer O'Dell explained that "hard" refers to crack cocaine. According to O'Dell, Bledsoe said Gibson was usually in town at night, and that he would drive his girlfriend's car, a damaged red Sunbird with a black convertible top. This was the first time Bledsoe had given O'Dell information.

Officer O'Dell testified that on the afternoon of Gibson's arrest, he was sitting in his car near the intersection of Martin Luther King and Dobbins Street. He noticed Gibson, whom he recognized from previous interactions, drive past him in a damaged red Sunbird with a black convertible top. Based on the information Officer O'Dell had received from Steel and Bledsoe, Officer O'Dell began to follow Gibson. As soon as Officer O'Dell was directly behind Gibson, Gibson began making a series of turns. During this time, other cars came between O'Dell and Gibson, and O'Dell lost sight of Gibson temporarily. Upon finding Gibson again, Officer O'Dell followed him at a distance through a series of additional turns. Officer O'Dell lost sight of Gibson briefly several more times.

Eventually, Officer O'Dell turned on his blue lights, and Gibson immediately opened the driver's door about six inches while his car was still moving. Officer O'Dell thought that Gibson was going to get out of the car and run. However, Gibson continued driving and "sped through the intersection at . . . , didn't yield, immediately turned, continued eastbound, and finally pulled over in front of the entranceway of the Evergreen Apartments." Officer O'Dell estimated that Gibson drove about two and a half blocks, or

approximately a quarter of a mile, after O'Dell initiated his blue lights and before Gibson stopped. Officer O'Dell said he had not seen Gibson violate any traffic laws before he turned on the blue lights.

As Officer O'Dell approached Gibson's car, it began to move forward. Officer O'Dell ordered Gibson to stop and get out of the car, and Gibson complied. Officer O'Dell testified that he immediately took Gibson into custody. While he was handcuffing Gibson, Officer O'Dell smelled burnt marijuana inside the car. Gibson was arrested for evading arrest, and Officer O'Dell retrieved $388 in cash, separated in several bundles, from Gibson's person. Officer O'Dell then put Gibson in the back of a patrol car and requested a canine officer to search Gibson's car. A bag of marijuana was recovered from underneath the driver's seat, and crumbs of crack cocaine were recovered from the driver's seat and between the seat of the driver's side and the door.

Officer O'Dell then retraced the route that he and Gibson had driven. O'Dell "thought something may have come out since the door was open and he didn't bail out." Officer O'Dell testified that he found a large bag of crack cocaine and a small bag of marijuana in front of 1542 Matthews Street. He also found a small bag of marijuana in front of 1524 Matthews Street, where O'Dell turned on his blue lights. Officer O'Dell did not see Gibson throw or drop these items, or anything else, from the car.

Following the proof at the hearing, the trial court denied the motion to suppress. The court found that Officer O'Dell had a reasonable suspicion to stop Gibson. Additionally, the court ruled that Gibson had no reasonable expectation of privacy in the drugs that he dropped out of the car. Citing State v. Baker, 966 S.W.2d 429 (Tenn. Crim. App. 1997), the court found that those drugs were abandoned for purposes of the Fourth Amendment.

Gibson later filed a renewed motion to suppress, asserting that Steel and Bledsoe never spoke with Officer O'Dell about Gibson. Attached to the motion as exhibits B and C were handwritten affidavits from Steel and Bledsoe. Steel's affidavit stated, in pertinent part:

> I never gave permission nor consent to Officer O'dell [sic] or say police to use my name as a witness or informant in the case against K. Gibson in the ongoing case against him.
>
> I never met the man until we both ended up in jail in Obion Co. Officer O'dell [sic] has slandered my name & is lying & I want justice.

-3-

. . . .

I have never told Derrick Odell [sic] that Keith Gibson was carrying drugs or selling drugs at any time.

Bledsoe's affidavit stated:

The only time I have talked O'dell [sic] was regarding my boyfriend [sic] charges in jail. He never asked about Keith gibson [sic] I never spoke to him about Keith Gibson. I have neve [sic] bought or known Keith for buying or selling drugs. I've never told him about the whereabouts of the drugs on his body.

At the hearing following the second motion, Jerry Steel testified that he was currently incarcerated in the Obion County Jail. He said he met Gibson in 2009. When asked whether he had ever talked to Officer O'Dell about Gibson, Steel replied, "I gave a statement stating that I haven't, but it's possible that I have. I really can't say." He testified that he had never bought drugs from Gibson. Steel said, "I'm guessing that I told O'Dell that I had known of [Gibson] selling drugs, that may have been a fact." He testified that "O'Dell has worked many of my cases before and there's been times to where I have given him information. Why I would have chose [sic] to have lied to O'Dell, I have no idea . . . ." Steel corrected his affidavit and said that the first time he met Gibson was not in the Obion County Jail but rather in 2009 when Steel "[saw] him, but . . . it wasn't dealing with drugs and him personally."

After the trial court expressed confusion over Steel's testimony thus far, Steel explained:

I was in jail. Keith Gibson comes next door to my pod. We're not – we wasn't incarcerated in the same pod. He comes next door telling me that they got up in court saying that I was an informant on his case. So I said, "Well, that's not true." And then – then I was under the impression from your – his lawyers, you and his other lawyer, that O'Dell, you all had – that he had made it out like I had purchased drugs from him, I know where he kept his drugs, I knew what kind of car he drove, and that – none of that was true. So whenever I wrote my statement, pretty much I felt like it was kind of toward O'Dell lying. It wasn't to protect Keith Gibson. . . . I thought being that I was [in custody] down in Chattanooga, that O'Dell was just using me for whatever reason, because I had no recollection of ever discussing Mr. Gibson with O'Dell.

-4-

Steel testified that O'Dell contacted him approximately a week before the hearing. Steel said:

> He brought to my recollection . . . the time that I had seen O'Dell in '07 concerning – he'd seen me on the streets. I had some stolen merchandise on me. He told me as long as – he confiscated it, said he'd give it back to the rightful owner. And he'd asked me – I don't recollect this, but he said he had asked me who's selling dope and that I had told him Mr. Gibson. Well, that's very possible, because while I was using, I would have told him I could buy drugs from the sheriff . . . if I thought it'd help me. But, the fact is, in '07, I didn't even know Mr. Gibson. So had I used his name, you know, I would have just been throwing it out there.

On cross-examination, Steel testified that Gibson wrote down information for Steel to include in the affidavit. Steel then wrote the statement and gave it back to Gibson.

Stephanie Bledsoe testified that she knew Gibson through her family. She said she never spoke with Officer O'Dell about Gibson and denied giving O'Dell any information concerning the type of car he drives or where he keeps his drugs. Bledsoe testified that she did not know Gibson to buy or sell drugs. She said that she previously spoke with Officer O'Dell, but that their discussion was limited to her boyfriend's case.

On cross-examination, Bledsoe testified that her cousin Sharita Bledsoe[1] was Gibson's friend. Sharita went with Bledsoe to Gibson's attorneys' office when Bledsoe provided her written statement. Bledsoe said:

> [Y]eah, she went, but that didn't have nothing [sic] to do with me saying what I said. . . . I didn't have a ride, and I asked her would she take me. It wasn't no force. They didn't force me to go or anything like that. I went on my own.

Officer O'Dell testified that he and Steel spoke about Gibson between March and April of 2009, not 2007. He said that Bledsoe came to his office on September 2 and spoke to him about her boyfriend's case. She later called him with the information about Gibson, whom she called "Pee Wee." O'Dell testified that he also had listened to phone conversations between Gibson and Sharita since Gibson had been in jail. In a phone call

---

[1] Because Sharita's last name is identical to Stephanie Bledsoe's, we will refer to Sharita by her first name.

placed later on the same day as the first suppression hearing, Gibson and Sharita discussed Stephanie Bledsoe. O'Dell testified that Sharita said in the phone call that she saw Stephanie Bledsoe on the street and "cussed her, said she was no longer her cousin, she didn't need to be around her or she'd snap her neck." Gibson and Sharita later discussed the statement Bledsoe gave to Gibson's attorneys. O'Dell testified:

> Sharita had said . . . "She'd better hope that she signs that statement or I'll whip her ass." When she took her to the lawyer's office, she said that she went into the lawyer's office with Ms. Bledsoe, went into the same room to make sure Stephanie wrote the statement, and stared a hole through her the whole time she wrote it.

Officer O'Dell was cross-examined regarding the passage of time between when he received information from Steel in March of 2009 and when he arrested Gibson in October of 2009. O'Dell testified that "the information I received from . . . [a] reliable informant, even after it passes, once I start getting new information on the same person from another source, it kind of falls into he's still doing the same thing." O'Dell testified that he had not seen Gibson between the time Steel gave him information and when Bledsoe gave him information.

Following the proof in the second hearing, the trial court denied Gibson's renewed motion to suppress. It found O'Dell's testimony to be credible and rejected the credibility of both Steel's and Bledsoe's testimony.

**Trial.**[2] At trial, Officer O'Dell testified consistently with his testimony at the two suppression hearings. As pertinent to the issues raised in this appeal, Officer O'Dell further described where he was when he first saw Gibson. He said:

> I was riding around in the northeast section of the town where we have a crime rate. I observed a group of males standing in a known drug area. I was down the road on the 800 block of Martin Luther King observing those males, to see if there was anything going on.

After trial, the jury convicted Gibson of possession of .5 grams or more of cocaine with intent to sell and simple possession of a controlled substance. Gibson now appeals the trial court's denial of his motions to suppress.

---

[2]In reviewing Gibson's motions to suppress, we consider evidence presented at the trial in addition to the suppression hearings. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

## ANALYSIS

Gibson argues that the trial court erred in denying his motions to suppress because Officer O'Dell lacked reasonable suspicion to stop Gibson. The State counters that the trial court correctly denied Gibson's motions to suppress. We agree with the State.

**Standard of Review.** The standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23.

**Investigatory Stop of Vehicle.** The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. The stop of a vehicle and the detention of its occupants constitutes a seizure within the meaning of both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. Whren v. United States, 517 U.S. 806, 809-10 (1996); State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000).

A warrantless search or seizure "is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). A warrant is not required for an investigatory stop if the officer has "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). Probable cause is not required for an investigatory stop. State v. Coleman, 791

S.W.2d 504, 505 (Tenn. Crim. App. 1989) (citing Terry, 391 U.S. at 27 and Hughes v. State, 588 S.W.2d 296, 305 (Tenn. 1979)).

The Tennessee Supreme Court has stated that a "[r]easonable suspicion is a less demanding standard than probable cause." Bridges, 963 S.W.2d at 492 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). Reasonable suspicion for an investigatory stop will be found to exist only when the events which preceded the stop would cause an objectively reasonable police officer to suspect criminal activity on the part of the individual stopped. State v. Levitt, 73 S.W.3d 159, 172 (Tenn. Crim. App. 2001); State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996). The likelihood of criminal activity required for reasonable suspicion is not as great as that required for probable cause, and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. United States v. Sokolow, 490 U.S. 1, 7 (1989); see also State v. Keith, 978 S.W.2d 861, 867 (Tenn. 1998).

Gibson argues that the trial court erred in denying his motion because the evidence admitted at the suppression hearings "proved conclusively" that Officer O'Dell lacked reasonable suspicion when he stopped Gibson. Gibson asserts that O'Dell's knowledge of the information provided by Steel and Bledsoe did not amount to reasonable suspicion. He further argues that O'Dell did not see Gibson commit any traffic violations such that he could lawfully stop Gibson. In support of his contention, Gibson cites several cases in which this Court held that an officer's observations of drivers suspected of driving under the influence or in an otherwise dangerous manner were insufficient to support a finding of reasonable suspicion. E.g., State v. Alorra D. Puckett, No. E2002-01959-CCA-R3-CD, 2003 WL 21638048 (Tenn. Crim. App., at Knoxville, July 9, 2003), perm. app. denied (Tenn. Dec. 8, 2003); State v. Ann Elizabeth Martin, No. E1999-01361-CCA-R3-CD, 2000 WL 1273889 (Tenn. Crim. App., at Knoxville, Sept. 8, 2000); State v. Smith, 21 S.W.3d 251 (Tenn. Crim. App. 1999).

The State asserts that Officer O'Dell had reasonable suspicion when he initiated the stop. This reasonable suspicion, according to the State, was based on the information O'Dell received from Steel and Bledsoe, the fact that Gibson was driving the car Bledsoe had described, the fact Gibson was present in a known drug area, and Gibson's evasive driving after O'Dell began following him. Relying on California v. Hodari D., 499 U.S. 621 (1991), and State v. Baker, 966 S.W.2d 429 (Tenn. Crim. App. 1997), the State additionally argues that Gibson lacked standing to challenge the drugs he dropped from the car because they were abandoned before Gibson was seized under the Fourth Amendment. Rather than fruit of the seizure, the drugs were abandoned and, the State argues, Gibson lost any expectation of privacy he may have had in them.

-8-

In denying Gibson's first motion to suppress, the trial court rejected his argument that Officer O'Dell lacked reasonable suspicion to initiate a stop. According to the trial court, Officer O'Dell had a reasonable suspicion based on, first, the information Steel gave Officer O'Dell. The court found Steel's information to be reliable, saying that "[he] had given [O'Dell] information previously which resulted in the arrest of another individual. The officer also knew that Mr. Steel had given information to other officers before and proved himself to be reliable." From Steel's tip, O'Dell knew that Gibson had sold drugs to Steel in the past. Second, the reasonable suspicion was based on Bledsoe's tip that Gibson always had drugs on him when he was in town and he kept them in his crotch. She also described the car Gibson drove. According to the court, O'Dell "had information from two sources that the defendant normally had drugs on him and sold drugs; he saw the defendant in that vehicle." Third, the court found Gibson's "evasive action" relevant to the officer's reasonable suspicion. The court said, "I would agree that evasive [action], in and of itself, would not constitute grounds to stop . . . the defendant under the facts of this case, but when all that is added together, I think that the officer had a reasonable suspicion to stop him." Additionally, the court ruled that Gibson had no reasonable expectation of privacy in the drugs that he dropped out of the car. Citing State v. Baker, 966 S.W.2d 429 (Tenn. Crim. App. 1997), the court found that those drugs were abandoned for the purposes of the Fourth Amendment.

Ruling on Gibson's renewed motion to suppress, the court found Officer O'Dell's testimony to be credible and Steel's and Bledsoe's testimony incredible. The court said:

> This court has heard Officer O'Dell on numerous occasions in this court. I've always found him to be a credible witness and to testify honestly. I've known Mr. Steel for some time, and just the opposite is true with him. I really wouldn't believe anything he tells me. . . . [B]ased upon what [Bledsoe] testified to today and observing her and also understanding the circumstances, I don't believe anything she said either.

The court thus denied Gibson's renewed motion to suppress.

In this case, the evidence does not preponderate against the trial court's denial of the motions to suppress. The trial court found that Officer O'Dell had reasonable suspicion sufficient to initiate a stop of Gibson's car. Nothing in the record preponderates against this determination. Officer O'Dell testified that he received two tips regarding Gibson's possession and sale of drugs. He testified that Steel, who had proven himself reliable with past tips, told him about personally purchasing drugs from Gibson. To the extent that Steel's testimony at the second suppression hearing contradicted his tip, the trial court resolved this question of credibility in favor of Officer O'Dell. Officer O'Dell testified that

Bledsoe told him Gibson usually had drugs on him when he was in town, he kept them in his crotch, he drove a damaged red Sunbird with a black convertible top, and he was usually in town at night. Although Bledsoe's testimony contradicted that of Officer O'Dell, the court again credited O'Dell's testimony.[3]

Furthermore, as soon as O'Dell began following Gibson, Gibson made a series of seemingly random, circular turns. Although flight alone does not establish reasonable suspicion, "'nervous, evasive behavior' by someone may contribute to the conclusion that further investigation is warranted." State v. Nicholson, 188 S.W.3d 649, 661 (quoting Illinois v. Wardlow, 528 U.S. 119, 125 (2000)). At trial, Officer O'Dell also testified that he first spotted Gibson driving by a known drug area. As the Tennessee Supreme Court has said, "[A] location's characteristics may be relevant to amassing reasonable suspicion." Nicholson, 188 S.W.3d at 661 (Tenn. 2006) (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)). Any one of these factors considered in isolation likely would not have given Officer O'Dell reasonable suspicion to stop Gibson. But considering them in the aggregate under the totality of the circumstances, O'Dell had a reasonable suspicion to believe criminal activity was occurring. The stop, therefore, complied with the requirements of the United States and Tennessee Constitutions.

In his brief, Gibson emphasizes that Officer O'Dell did not witness Gibson violating any traffic laws. He discusses a number of cases in which a stop was found to be illegal when the police had not first observed any traffic violations or dangerous driving. E.g., State v. Alorra D. Puckett, No. E2002-01959-CCA-R3-CD, 2003 WL 21638048 (Tenn. Crim. App., at Knoxville, July 9, 2003), perm. app. denied (Tenn. Dec. 8, 2003); State v. Ann Elizabeth Martin, No. E1999-01361-CCA-R3-CD, 2000 WL 1273889 (Tenn. Crim. App., at Knoxville, Sept. 8, 2000); State v. Smith, 21 S.W.3d 251 (Tenn. Crim. App. 1999). In those cases, the police lacked sufficient justification to stop the defendants based on violations of traffic laws or dangerous driving. Alorra D. Puckett, 2003 WL 21638048, at *3; Ann Elizabeth Martin, 2000 WL 1273889, at *5-6; Smith, 21 S.W.3d at 257-58. This emphasis is misplaced, however, because it overlooks the factors, unrelated to Gibson's lawful operation of the vehicle, that led to Officer O'Dell's reasonable suspicion. Here, the reasonable suspicion was based on informant tips, Gibson's presence near a known

---

[3]We note that Gibson does not argue, and we need not decide, whether the two informants' tips pass muster under the two-pronged reliability analysis of Jacumin such that they independently provided reasonable suspicion. See State v. Pulley, 863 S.W.2d 29, 31 (Tenn. 1993) (requiring a showing of an informant's credibility and basis of knowledge when reasonable suspicion derives from an informant's tip) (citing State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989)). It is sufficient that these tips, in conjunction with all the other information known to Officer O'Dell, provided reasonable suspicion under the totality of the circumstances.

drug area, and Gibson's evasive actions, not a traffic violation. Albeit a close question, these factors combined support reasonable suspicion for Officer O'Dell to legally stop Gibson. Because the stop was legal, and because Gibson asserts no other basis for challenging the trial court's ruling, the denial of Gibson's motion to suppress is proper as to all the evidence.

Additionally, we are compelled to address the State's and the trial court's mistaken reliance on California v. Hodari D., 499 U.S. 621 (1991), and State v. Baker, 966 S.W.2d 429 (Tenn. Crim. App. 1997), for the proposition that Gibson could not challenge the admissibility of the drugs he dropped out of the car after O'Dell turned on his blue lights. The Tennessee Supreme Court has rejected the holding of Hodari D., making it, and our previous cases relying on it, inapplicable here. See State v. Randolph, 74 S.W.3d 330, 337 (Tenn. 2002).

In Hodari D., the United States Supreme Court defined "seizure" for Fourth Amendment purposes to exclude a show of police authority to which a person does not yield. 499 U.S. at 625-26. The Court held that Hodari was not seized when an officer pursued him on foot; he was seized only when the officer tackled him. Id. at 629. As a result, the discovery of drugs Hodari discarded during the foot pursuit could not be fruit of the seizure and subject to exclusion, simply because Hodari was not "seized" at the time he discarded them. Id. at 628-29.

In State v. Baker, this Court applied Hodari D.'s definition of "seizure" to find that Baker was not seized when she discarded drugs while fleeing from the police. 966 S.W.2d at 433. There, police officers traveling in a patrol car followed Baker and turned on their blue lights after she ran a stop sign. Id. at 431. She did not pull over until after she had thrown a marijuana-filled condom out of her car. Id. We held that Baker was not seized when she threw the marijuana out of her car, and that she had abandoned the marijuana such that she had no reasonable expectation of privacy in it. Id. at 433. Implicit in this conclusion is that the marijuana was not fruit of the seizure because Baker was not seized when she discarded it.

In State v. Randolph, the Tennessee Supreme Court rejected Hodari D.'s definition of "seizure." 74 S.W.3d 330, 337 (Tenn. 2002). Rather, under Tennessee law, the test for determining a seizure is whether a reasonable person would believe he was free to leave. Id. The Court has repeatedly held that a person is seized when an officer initiates his blue lights. Id. at 338 (citing State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) ("Upon turning on the blue lights of a vehicle, a police officer has clearly initiated a stop and has seized the subject of the stop . . . ."); State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993) ("When an

-11-

officer turns on his blue lights, he or she [sic] has clearly initiated a stop.")). In rejecting Hodari D.'s definition of "seizure," Randolph abrogated our holding in Baker.

Randolph makes clear that in this case, Gibson was seized as soon as Officer O'Dell initiated his blue lights. Unlike the Supreme Court's conclusion in Hodari D., Gibson discarded the drugs only after being seized. Contrary to the trial court's ruling and the State's argument, if the seizure was illegal, Gibson would have maintained his ability to contest the admissibility of the drugs as fruit of an illegal seizure. However, because we have determined that the seizure was legal and based on reasonable suspicion, there was no impermissibly obtained evidence to suppress. Accordingly, Gibson is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE