# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 14, 2009 Session

## STATE OF TENNESSEE v. ROBERT COOPER

### Direct Appeal from the Criminal Court for Shelby County
### No. 06-03933    James C. Beasley, Jr., Judge

### No. W2008-01339-CCA-R3-CD   -   Filed September 29, 2010

The appellant, Robert Cooper, pled guilty to one count of possession of more than 300 grams of cocaine with the intent to sell and one count of possession of more than 300 grams of cocaine with the intent to deliver.  The trial court imposed a total effective sentence of eighteen years in the Tennessee Department of Correction.  As a condition of his pleas, the appellant reserved the following certified question of law:

> Whether the stop of the [appellant] for a minor "cite and release" traffic violation which provided for a fine only, the detention of the [appellant], the placement of the [appellant] in the secured area of the officer's patrol car, the use of a drug dog "run" around the [appellant's] vehicle, and the subsequent search of the [appellant's] vehicle violated the rights of the [appellant] under the federal and state constitutions and, therefore, all evidence resulting from the seizure and search should be suppressed.

Upon review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

William D. Massey and Lorna S. McClusky, Memphis, Tennessee, for the appellant, Robert Cooper.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris Scruggs, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

The appellant's convictions stem from the discovery of approximately eighty-five pounds of cocaine in his vehicle during a traffic stop. Prior to trial, the appellant filed a motion to suppress the evidence. At the suppression hearing, Memphis Police Officer Kevin Perry, a member of the West Tennessee Violent Crime and Drug Task Force, testified that on September 23, 2005, he was working drug interdiction on Interstate 40 with Officer Mike Blair whom he was training. Officer Perry was sitting in his patrol car on the right shoulder of eastbound Interstate 40, acting as backup for Officer Randolph who was finishing a traffic stop. As Officer Perry watched traffic in his left mirror, he saw a burgundy-colored, two-seat, Nissan 350Z Roadster sports car pass by in the right lane without moving into the left lane. Officer Perry said the driver of the Nissan was violating the "move over law."[1] He explained that a motorist approaching a law enforcement officer engaged in a stop in the emergency lane is required to move their vehicle into the next lane if there is no obstruction or, if there is an obstruction, to reduce the speed of the vehicle. See Tenn. Code Ann. § 55-8-132(b). Officer Perry stated that there was no obstruction which would have impeded the car's shift into the left lane. Officer Perry acknowledged that at the time of the offense, a

---

[1] The statute in effect at the time of the offense specifically provided:

> (b) Upon approaching a stationary authorized emergency vehicle, when such vehicle is giving a signal by use of flashing lights, a person who drives an approaching vehicle shall:
>
> (1) Proceeding with due caution, yield the right-of-way by making a lane change into a lane not adjacent to that of the authorized emergency vehicle, if possible with due regard to safety and traffic conditions, if on a highway having at least four (4) lanes with not less than two (2) lanes proceeding in the same direction as the approaching vehicle; or
>
> (2) Proceeding with due caution, reduce the speed of the vehicle, maintaining a safe speed for road conditions, if changing lanes would be impossible or unsafe.

See Tenn. Code Ann. § 55-8-132(b). The statute further provided that "[a]violation of this section is a Class C misdemeanor punishable only by a fine of fifty dollars ($50.00)." Id. at (e).

violation of the "move over law" was a Class C misdemeanor punishable by a fifty-dollar fine. Tenn. Code Ann. § 55-8-132(e).

Officer Perry said the car passed him at sixty-five miles per hour, too fast for him to see the race or gender of the driver. Officer Perry "pulled out" and followed the car approximately two miles before the driver stopped. He did not see the driver commit any additional violations during the pursuit. After a couple of miles, Officer Perry activated his blue lights, stopped the vehicle, and parked behind it. Officer Perry explained that the video camera in his police vehicle began recording the stop when he activated his blue lights.

Officer Perry approached the passenger side of the car and asked the driver, the appellant, for his driver's license and registration. Officer Perry saw three cellular telephones in the front of the car, which he thought was "odd." The appellant handed Officer Perry his license and registration, which had been issued by the state of Maryland.

Officer Perry asked the appellant to step out and walk to the rear of the car so he could explain the reason for the stop. The appellant complied, and Officer Perry told him that he had violated the "move over law." In response to questioning by Officer Perry, the appellant stated that he had purchased the car approximately one month earlier. When Officer Perry asked the appellant if his driver's license was valid, the appellant responded that it was. He stated that he had previously had "child support issues" but that those issues had been resolved.

Officer Perry stated that during the conversation, the appellant "blatted his body," which he described as

> turn[ing] in like in a sideways position, kind of almost like a stance a police officer takes when they're talking to a suspect, you know, kind of with their body turned to the right. You're not exactly facing head on. You're more facing at an angle.
>
> . . . .
>
> It's kind of unusual to see that on a normal person cause usually that's something you see on a police officer cause it's something we do for, you know, survival, you know, just for officer safety. It's a defensive stance.

He said that the appellant began "spinning his car keys in his hand" and that he "fidget[ed]," putting his hand in and out of his pocket. Officer Perry said that because of the appellant's

nervousness, his stance, and his fidgeting, he believed the appellant was becoming defensive about the conversation.

Officer Perry also questioned the appellant about his travel itinerary. The appellant said he was returning to Baltimore, Maryland, from Dallas, Texas, where he had helped a family from Louisiana relocate after Hurricane Katrina. Officer Perry said the appellant did not know many details about the family or the relocation, which he found suspicious. Officer Perry asked the appellant to sit in the back of his police sport utility vehicle (SUV), a Ford Expedition, while he checked the appellant's driver's license and registration. Officer Perry said that he put the appellant in the SUV "for safety" and that he was "trained to actually put [offenders] in the car" while doing a license check. Officer Perry sat in the front seat of the SUV; the appellant was placed in the middle seat; and Xena, Officer Perry's drug dog, was in a cage in the rear compartment. Officer Perry did not frisk the appellant before placing him in the patrol vehicle. On cross-examination, Officer Perry acknowledged that the appellant appeared to have "[a]ppropriate papers" and that he had no reason to believe another crime was being committed. He said he "thought that [the appellant's] travel itinerary was a little suspicious but at that time it was just a suspicion."

After the appellant got into the officer's SUV, Officer Perry radioed Memphis Police Department's "Station B" to request a check of the appellant's driver's license and vehicle information. Officer Perry said he was placed on "stand by," meaning he was essentially "in line" with other officers who were likewise requesting information.

While waiting for Station B to contact him, Officer Perry engaged the appellant in conversation. Officer Perry said that the appellant "began to contradict himself about his job." Officer Perry explained, for example, that the appellant said he had a contractor's license from the city of Baltimore to do demolition and renovation but then stated that he did not have certification. When Officer Perry asked the appellant if he had anything illegal in his car, the appellant said no and began talking about his church and the guitar he played in the church band.

Officer Perry said he became suspicious that the appellant might be involved in criminal activity because of his defensive stance, nervousness, and fidgeting. Officer Perry specifically found suspicious the appellant's possession of three cellular telephones, his unnecessarily lengthy answers to some questions, and his eagerness to talk about God and charity work. Officer Perry opined that the appellant "seemed like he was going out of his way to try to validate that he was a good guy." Officer Perry also noted that the appellant was evasive when answering questions about his travel to Texas, noting that it was a "source state," meaning that "a lot of illegal narcotics cross from Mexico into the State of Texas."

Officer Perry showed the appellant a consent to search form, explained the form to him, and asked for permission to search the appellant's car. The appellant responded that he was in a hurry and did not agree to a search. Officer Perry then retrieved Xena from the back of the SUV. When Officer Perry walked toward the appellant's car with the dog, the appellant said, "[N]o, you can go ahead and search it." Officer Perry told the appellant "not to worry about it." On cross-examination, Officer Perry acknowledged that he was trained to use the time while he waited for a license verification "to ferret out criminal indicators" and possibly obtain permission to search. Officer Perry acknowledged that he was aware that if the appellant did not grant consent to search, he could utilize the drug dog.

Officer Perry explained that Xena was a "passive alert dog. So we would go to the back of the vehicle and I'd give her the command and she'd just start making laps, starts making laps around the vehicle." According to Officer Perry, the dog alerted near the driver's door and underneath the rear bumper. Specifically, Officer Perry said, "As she got around the driver's side of it she slowed down, her ears started to tilt back, her breathing started to change and . . . she started taking an interest right around the back, back behind the driver's door near the rear tire." Because of the alerts, Officer Perry asked the appellant if anyone had been using drugs in or near the car. The appellant said "his cousins had borrowed the vehicle and had been smoking marijuana."

Officer Perry said he, Officer Blair, and Officer Randolph, who had joined the stop, began searching the appellant's car. Officer Perry explained that the car did not have a backseat and that the car's glove box was located behind the passenger seat. Officer Perry said "the glove box had glue going all the way around it . . . [that] was seeping out from the edges and stuff." He stated that the glue did not "look professional" and was "not consistent with factory." Officer Perry pried open the tray and discovered a "green saran wrapped package that had the shape and appearance of contraband." He cut open the package and found a white powder inside. The appellant was arrested, and the car was taken back to the interdiction office for a more thorough search. The subsequent search revealed that the tray in the glove box led to a secret compartment which had been installed beside the glove box and behind the speakers. In total, police found thirty-three packages containing approximately eighty-five pounds of cocaine in the car.

Officer Perry estimated the entire stop lasted approximately ten minutes. He acknowledged that during the stop he did not make another call to Station B and that Station B never contacted him about checking the appellant's driver's information. Officer Perry also acknowledged that he normally contacted the Blue Lightning Operation Center (BLOC),

a customs agency, in Gulfport, Mississippi, for that information.[2]  He further acknowledged that he once had to wait forty-five minutes for a response from Station B.  He said that he would not have let the appellant leave until he received information from Station B concerning the appellant's license.

The motion to suppress is not included in the record.  However, in the memorandum supporting the appellant's motion to suppress the appellant challenged the constitutionality of the placement of the appellant in the police car without probable cause during the stop for a "cite and release offense."  The appellant specifically relied upon State v. Berrios, 235 S.W.3d 99 (Tenn. 2007), in which our supreme court suppressed evidence discovered when a defendant who had been stopped for a traffic offense gave consent to search after being placed in the back of a police cruiser.  The appellant contended that he was illegally detained when Officer Perry placed him in the back of the police vehicle and that the illegal detention tainted the canine sweep of his car.  The State argued that Berrios was distinguishable in that the instant search was not conducted pursuant to consent and that the dog sniff did not constitute a search.

The trial court found that the appellant was in violation of the "move over law"; therefore, the initial stop was valid.  The court noted that although Officer Perry stated that the appellant was nervous and defensive, the video of the stop did not depict the appellant acting in a nervous and defensive manner.  Indeed, the trial court noted "that most people are nervous when they get stopped by police."  However, the trial court found that the appellant "talked too much" and "answered questions . . . beyond the norm, expounding on things that were not necessary, going into extremely greater detail than it would appear to be necessary."  The court said the appellant's manner of conversation would lead "a normal person to think that there's something amiss."  The court also noted that the appellant's responses to the officer's questions about his driver's license and child support issues raised a question regarding the validity of the appellant's license and justified further inquiry.

The court stated that initially the instant case appeared to be "pretty much all square on Berrios."  However, after careful review the court concluded that Berrios was distinguishable.  The court stated that for Berrios to be applicable "there needs to be some type of improper action by the police that caused . . . [the appellant] to give up his Fourth Amendment right[s]."  The court found that Officer Perry did not unreasonably delay the stop and that the drug dog alerted on the car during the legitimate course of the stop, giving the officer probable cause to search the car.  The court concluded that even if the appellant should not have been placed in the patrol vehicle, the placement "did [not] lead to the

_____

[2] Officer Perry was not asked to explain why he chose to contact Station B rather than BLOC.

subsequent finding of the drugs." Accordingly, the trial court denied the appellant's motion to suppress the evidence discovered during the search of his car.

After the trial court denied the motion to suppress, the appellant pled guilty to both counts of possession of cocaine. As a condition of his guilty pleas, the appellant properly reserved the following certified question of law, which the State, the appellant, and the trial court agreed was dispositive of the case:

> Whether the stop of the [appellant] for a minor "cite and release" traffic violation which provided for a fine only, the detention of the [appellant], the placement of the [appellant] in the secured area of the officer's patrol car, the use of a drug dog "run" around the [appellant's] vehicle, and the subsequent search of the [appellant's] vehicle violated the rights of the [appellant] under the federal and state constitutions and, therefore, all evidence resulting from the seizure and search should be suppressed.

See Tenn. R. Crim. P. 37(b)(2)(i).

## II. Analysis

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

Initially, we note that both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000); see also State v. Hicks, 55 S.W.3d 515, 527 (Tenn. 2001). Under both constitutions, evidence discovered as a result of a warrantless search is "'subject to suppression unless the State demonstrates that the search or seizure was conducted

pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (quoting State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)); see also Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971).

The United States Supreme Court announced one such exception to the warrant requirement in Terry v. Ohio, 392 U.S. 1, 21 (1968), holding that a law enforcement officer may conduct a brief investigatory stop of an individual if the officer has a reasonable suspicion based upon specific and articulable facts that a criminal offense has been, is being, or is about to be committed. See also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). This standard also applies to the investigatory stop of a vehicle. Delaware v. Prouse, 440 U.S. 648, 663 (1979); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). In other words, a law enforcement officer may stop a vehicle if the officer possesses a reasonable suspicion supported by specific and articulable facts that an offense has been, is being, or is about to be committed. Watkins, 827 S.W.2d at 294.

The Supreme Court has observed that "[a]rticulating precisely what 'reasonable suspicion' . . . mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695 (1996); see also State v. Smith, 21 S.W.3d 251, 256 (Tenn. Crim. App. 1999). "Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of criminal activity." Binette, 33 S.W.3d at 218 (citing Ornelas, 517 U.S. at 696). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norwood, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); Watkins, 827 S.W.2d at 294. These circumstances include, but are not limited to, "[the officer's] objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Watkins, 827 S.W.2d at 294 (citation omitted).

In the instant case, the appellant does not challenge the validity of the initital stop and the record is clear that Officer Perry had probable cause to justify the traffic stop because he witnessed the appellant violate the "move over law." See State v. Harris, 280 S.W.3d 832, 840 (Tenn. Crim. App. 2008). Additionally, we note that "[r]equests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop," making Officer Perry's questions in this regard permissible. Id. (citation and internal quotations omitted).

However, the appellant asserts that Officer Perry illegally detained him by placing him in the police vehicle; therefore, the discovery of the drugs in his car was a result of the illegal detention and should be suppressed. During an investigatory traffic stop, an officer's actions must reasonably relate to the circumstances prompting the stop. State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002). Additionally, the detention must not last longer than needed to effectuate the reason underlying the stop, with the officer "'diligently pursu[ing] a means of investigation that was likely to confirm or dispel their suspicions quickly.'" Id. (quoting State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998)). Further detention will be justified if, during a valid stop, law enforcement officers develop a reasonable suspicion that the individual was engaged in other criminal activity. See United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998).

The appellant argues that the instant case is controlled by State v. Berrios, 235 S.W.3d 99 (Tenn. 2007), while the State contends the instant case is more akin to State v. England, 19 S.W.3d 762, 766 (Tenn. 2000). As we stated earlier, Berrios concerned a search conducted pursuant to consent given after a traffic offender was stopped, frisked, and placed in a locked patrol car. Berrios, 235 S.W.3d at 107-10. In England, our supreme court held that canine sweeps are not a "search" under the Fourth Amendment and are reasonable if performed during the time necessary to effectuate the traffic stop. England, 19 S.W.3d at 766-68.

In making its ruling, the trial court observed it did not believe "that you're any safer sitting in the back of a squad car than you are standing off to the side of the road" but noted that "courts have said . . . officers can do that for safety purposes." The trial court stated:

> Even if, at least in my mind, my analysis of the law, even if that action was illegal in placing him in the back of that squad car, I don't see that [the appellant] did anything that caused the officer to violate his rights to have his car searched. It would appear that he refused to consent, the officer still in a timely fashion, searched – didn't search, but ran his dog around the car, got an indication of drugs, and then subsequently searched.
>
> I think the question would be more akin to Berrios if [the appellant] had given a consent. . . .
>
> You know, again, when I started this, I looked at this as being pretty much all square on Berrios. But the more I dug into Berrios and the more I looked at it, I can obviously see a distinction there. And, to me, again, if this same activity had

occurred without putting [the appellant] in the car, I think it would have been legal. No question about it. The only difference is, they put him in the back of a squad car for another minute or two.

The evidence adduced at the suppression hearing revealed that the stop lasted approximately ten minutes, with the appellant being "in the back of [the police vehicle] for two minutes, two-and-a-half minutes before the officer's dog alerted on the car." Officer Perry testified that he placed the appellant in the police vehicle because of safety concerns and then waited on "standby" for Station B to respond to his request for information regarding the appellant's driver's license and vehicle registration. During the wait, Officer Perry ran his drug dog around the appellant's vehicle, and the dog "alerted" on the vehicle. We agree with the State that England is controlling in the instant case. Here, the dog sniff occurred during a time reasonably required for the officer to complete the traffic stop. See Illinois v. Caballes, 543 U.S. 405, 407-08 (2005). The dog's alerts gave the officer probable cause to search the appellant's car. Therefore, we conclude that there is no basis on which to suppress the drugs discovered during that search.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-10-