# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 14, 2011 Session

## STATE OF TENNESSEE v. CHARLES EDWARD DURHAM

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-B-1387    Cheryl A. Blackburn, Judge**

---

### No. M2010-02400-CCA-R3-CD - Filed May 9, 2012

---

The appellant, Charles Edward Durham, was convicted in the Davidson County Criminal Court of possession of not less than one-half ounce but not more than ten pounds of marijuana in a school zone with the intent to sell and of being a felon in possession of a firearm. The trial court imposed a total effective sentence of three years in the Tennessee Department of Correction. On appeal, the appellant challenges the trial court's denial of his motion to suppress evidence that he alleges was discovered after he was illegally detained and the sufficiency of the evidence supporting his drug conviction. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JERRY L. SMITH, J., not participating.

L. Braxton Felts, Jr., Nashville, Tennessee, for the appellant, Charles Edward Durham.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

The State's proof at trial revealed that in October 2008, the North Crime Suppression Unit (CSU) of the Nashville Metropolitan Police Department (Metro) received an anonymous complaint regarding the sale of drugs in a specific apartment complex off W.H. Davis Drive

in North Nashville. Because CSU was responsible for investigating "street level crimes," which included the sale of narcotics, the unit arranged to go to the area on the night of October 8, 2008, to investigate the complaint. The apartment complex in question was located within one thousand feet of Creative Academy, a child care center.

Officers Yannick Deslauriers,[1] Jean McCormack, and Matthew Valiquett, members of the surveillance team, positioned themselves around the apartment complex, with Officer Deslauriers parked in front of the building. Officer Dale BeCraft, who was working undercover, went to the area in an unmarked vehicle. He was accompanied by a confidential informant (CI), who was wired with a radio transmitter so the officers could monitor any transaction.

During the investigation, a man named Tory Alexander parked beside Officer Deslauriers and went into the apartment at 1250 W.H. Davis Drive. Shortly thereafter, another man came from the direction of the apartment. Officer BeCraft told the CI to ask the man for drugs.

As the man was getting into his vehicle, the CI approached and asked for "a thirty," which was "street lingo" for thirty dollars' worth of crack cocaine. After that conversation, the CI went to 1250 W.H. Davis Drive. The CI knocked on the door, and the appellant answered. The CI asked the appellant for "a thirty." The appellant responded, "[O]kay, wait a minute," then closed the door. The officers believed the appellant was going to procure the drugs; however, no one ever came back to the door. The CI eventually returned to the car.

Within moments, Officer Deslauriers saw Alexander sneak from behind the apartment complex, having exited from the apartment's back door. Alexander "crouched down as if he was trying to hide[,] . . . stopped at the corner of the building[,] . . . looked around in the direction of the confidential informant[,] . . . ducked down low[,] and got into his vehicle." Alexander left and drove around for a few minutes before returning to the apartment complex. Upon Alexander's return, the appellant came out the back door of the apartment, got into the car, and the two men left.

Officer McCormack and other officers followed Alexander. He drove "in circles" for a few minutes then parked at a dormitory next to the apartment complex. Officer McCormack alerted the other officers that she planned to approach the vehicle. Officer McCormack pulled her unmarked vehicle in front of Alexander's car and activated her vehicle's blue lights. As she did so, the appellant got out of the vehicle and started backing

---

[1] At the time of the incident, Officer Deslauriers was a member of the CSU; however, at the time of trial, he was an agent with the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives.

up.

When Officer McCormack got out of her car, she was wearing a vest that clearly identified her as a police officer. Alexander, who was still in the car, raised his hands. Officer McCormack told the appellant to stop, but he began running. Officer McCormack alerted the other officers that she was pursuing the appellant on foot, and Officer Deslauriers joined the chase. They yelled at the appellant, "[P]olice, stop running." Ultimately, Officer Deslauriers apprehended the appellant in a field across the street.

Officer Deslauriers noticed that the appellant smelled like marijuana. Officer Deslauriers searched the appellant and found what he believed to be marijuana, $641 in cash, and keys to a Lexus that was parked in front of 1250 W.H. Davis Drive. After he was arrested, the appellant told Officer Deslauriers that he was not employed and that he lived with his girlfriend. However, when Officer Deslauriers spoke with the appellant's girlfriend, she stated that the appellant lived in the apartment complex. Tennessee Bureau of Investigation special agent forensic scientist Jennifer Sullivan testified at trial that she tested the substance found by Officer Deslauriers and that it was 11.3 grams of marijuana. Lieutenant William Mackall, an expert in narcotics investigations, testified that the marijuana had a "street value" of approximately $110 to $120.

When Alexander was apprehended, he was searched by Officer Valiquett. Officer Valiquett found a small baggie containing a substance he believed to be marijuana. Agent Sullivan tested the substance and determined that it was 2.4 grams of marijuana. Lieutenant Mackall said the marijuana had an approximate "street value" of $25. Alexander also had a white pill that Agent Sullivan confirmed was not a controlled substance.

While police were waiting for a search warrant, two people stopped at the apartment and attempted to buy marijuana. After the warrant was obtained, Officers Deslauriers, McCormack, and Valiquett searched the apartment. In the kitchen, Officer Deslauriers found three sets of digital scales. Lieutenant Mackall explained that drug users typically do not use digital scales but that drug dealers commonly use digital scales to weigh drugs for sale. Officer Deslauriers found a marijuana cigarette on a table and a large bag containing 52.8 grams of marijuana on an entertainment center in the kitchen. Lieutenant Mackall believed that the bag of marijuana contained an amount larger than a typical user would have and that the marijuana had an approximate "street value" of $160 to $400. Officer McCormack found marijuana residue and nine "7.62 rounds" in a vase. Officer Valiquett found a box of .44 caliber rounds, a box of 20 gauge shotgun shells, and a black pistol holster. Further, the officers collectively found $920 in cash in the residence. Combined with the money collected from the appellant, the police found a total of $1601, consisting of two $100 bills, two $50 bills, fifty-one $20 bills, twenty-five $10 bills, six $5 bills, and one $1 bill.

Lieutenant Mackall explained that drug dealers usually carried large sums of cash, often in smaller denominations.

In a grill outside the back door of the apartment, Officer McCormack found an RG .22 caliber revolver that fit inside the holster found by Officer Valiquett. In a lot adjacent to the area outside the back door, Officer Deslauriers found a plastic bag containing approximately twenty plastic sandwich baggies with the bottom corners torn off and saw a substance that appeared to be marijuana residue inside. He opined that the bags could have been thrown from the back door of the apartment. Lieutenant Mackall noted that drug dealers often tear or cut the bottom corners of plastic sandwich baggies and package drugs for sale in the torn corners.

During a search of the Lexus, Officer Deslauriers found an SKS assault rifle in the trunk. The rounds found in the apartment fit inside the rifle. Additionally, Officer Deslauriers found paperwork in the Lexus, including an insurance statement and various receipts, that indicated the appellant owned the Lexus and that his address was 1250 W.H. Davis Drive. During the search of the appellant, Alexander, the apartment, and the Lexus, police did not find any items, other than the single marijuana cigarette, that were typically for the use of marijuana.

James Oliphant testified on behalf of the appellant. Oliphant said that on October 8, 2008, he lived at 1246 W.H. Davis Drive and that there was only one apartment located between his residence and 1250 W.H. Davis Drive. Oliphant said that "Mike" and "a taller guy" lived at 1250 W.H. Davis Drive but that the appellant did not. However, he stated that the appellant sometimes came by to check the apartment for Mike, who was incarcerated. Oliphant never noticed heavy traffic coming in or out of the apartment. On cross-examination, Oliphant acknowledged that in 2009 he was convicted of giving a false name to police.

Based upon the foregoing, the jury found the appellant guilty of possession of not less than one-half ounce but not more than ten pounds of marijuana in a school zone with the intent to sell. Prior to trial, the appellant pled guilty to being a felon in possession of a firearm. The trial court imposed a total effective sentence of three years in the Tennessee Department of Correction. On appeal, the appellant challenges the trial court's denial of his motion to suppress evidence that he alleges was discovered after he was illegally detained by police. He also challenges the sufficiency of the evidence supporting his drug conviction.

## II. Analysis

### A. Suppression of Evidence

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In the appellant's motion to suppress, he contended that police did not have reasonable suspicion to stop the vehicle in which he was a passenger, and, therefore, the seizure and search of his person and the subsequent search of the apartment violated his rights under the Fourth Amendment to the United States Constitution and article I, section seven of the Tennessee Constitution.

The proof at the suppression hearing was similar to the proof at trial. During an investigation into an anonymous complaint of drug activity, CSU officers went to an apartment building in North Nashville. After their arrival, officers saw Alexander go into the apartment at 1250 W.H. Davis Drive, and a black male exited that apartment. As the man started getting into his car, the CI asked him for "a thirty." The man pointed toward the apartment and said, "[T]hat's the spot." The CI returned to Officer BeCraft and told him "[T]hat might be a good stop, that [man's] car smells like marijuana."

The CI knocked on the door of the apartment recommended by the man. The appellant answered, and the CI asked him for a "thirty." Officer Deslauriers, who was listening to the transaction, testfied that the appellant responded either "yeah, wait a minute" or "okay, wait a minute" and closed the door. The officers believed the CI was going to make a purchase of crack cocaine from the residence. While the CI waited, Alexander came from behind the apartments, "looked around the corner towards where the confidential informant and the front door of the apartment were[,] . . . kind of crouched down[,] and went to his car." Alexander left, drove around for a few minutes, then returned to pick up the appellant who had also snuck out the back of the apartment.

The officers followed Alexander and the appellant as they "looped" around the neighborhood, which Officer McCormack believed was an indication that the appellant and

Alexander thought they were being followed by police and were attempting to hide something. After Alexander backed into a parking space, Officer McCormack parked in front of him, leaving space for Alexander to "squeeze" his car out, and she activated her car's blue lights to detain him and the appellant. The appellant got out of the car. Officer McCormack identified herself as a police officer and told the appellant to stop, but he began running. Eventually, Officer Deslauriers apprehended the appellant.

Following the hearing, the trial court denied the motion to suppress, finding that, based on the totality of the circumstances, the police had reasonable suspicion to stop the appellant. On appeal, the appellant contends that the police did not have any "specific and articulable facts which would give rise to a reasonable suspicion that [the appellant] or anyone in Mr. Alexander's vehicle was committing or soon [would] commit a felony." The State maintains that the trial court correctly found that police had reasonable suspicion to stop the appellant. We agree with the State.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search or seizure is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000); see also State v. Hicks, 55 S.W.3d 515, 527 (Tenn. 2001). "Because stopping an automobile without a warrant and detaining its occupants unquestionably constitutes a seizure, the State . . . carrie[s] the burden of demonstrating the applicability of an exception to the warrant requirement." State v. Harris, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

The United States Supreme Court announced one such exception to the warrant requirement in Terry v. Ohio, 392 U.S. 1, 21 (1968), holding that a law enforcement officer may conduct a brief investigatory stop of an individual if the officer has a reasonable suspicion, based upon specific and articulable facts, that a criminal offense has been, is being, or is about to be committed. See also State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). This standard also applies to the investigatory stop of a vehicle. Delaware v. Prouse, 440 U.S. 648, 663 (1979); State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). In other words, a law enforcement officer may stop a vehicle if the officer possesses a reasonable suspicion supported by specific and articulable facts that an offense has been, is being, or is about to be committed. Watkins, 827 S.W.2d at 294.

The Supreme Court has observed that "[a]rticulating precisely what 'reasonable suspicion' . . . mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695 (1996); see also State v. Smith, 21 S.W.3d 251, 256 (Tenn. Crim. App. 1999). "Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of

criminal activity." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (citing Ornelas, 517 U.S. at 696). "The specific and articulable facts must be judged by an objective standard, not the subjective beliefs of the officer making the stop." State v. Norwood, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996) (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Accordingly, in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances. United States v. Sokolow, 490 U.S. 1, 8 (1989); Watkins, 827 S.W.2d at 294. These circumstances include, but are not limited to, "[the officer's] objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." Watkins, 827 S.W.2d at 294 (citation omitted).

We agree with the appellant and the State that the appellant was seized when Officer McCormack pulled in front of Alexander's vehicle and activated her vehicle's blue lights. See Binette, 33 S.W.3d at 218. Therefore, the police needed to have developed reasonable suspicion by that point.

The trial court summarized the totality of the circumstances supporting a finding of reasonable suspicion as follows:

> (1) the police received a complaint about drug activity occurring at an apartment complex however no specific apartment number [was] provided; (2) the police went to the complex to conduct an investigation, bringing a CI equipped with a wire to attempt undercover buys; (3) upon arrival at the complex an unknown male [was] observed departing a specific apartment and the CI ask[ed] this individual in street language to buy $30 of crack cocaine to which the unknown male respond[ed] by pointing out a specific apartment while stating, "that's the spot"; (4) the CI approach[ed] the apartment unit pointed to by the unknown male and ask[ed] the man who answer[ed] the door (the [appellant]) "for a 30" (street language for $30 of crack cocaine); (5) instead of declining or responding like he d[id] not understand, the uncontroverted testimony before the Court is that the [appellant] t[old] the CI "okay" and t[old] him to wait a minute; (6) while the CI remain[ed] on the doorstep, officers observe[d] another male (later identified as Mr. Alexander) exit the back of the apartment complex, look around suspiciously and drive off, returning shortly thereafter to pick up [the appellant]. Officer McCormack testified that in her experience conducting narcotics

investigation, random driving and looping behavior is indicative of someone who believes he may be followed by the police and is trying to hide something.

The appellant challenges the trial court's findings, arguing that "[t]he drug complaints as well as the tip to the CI were made by unknown persons of unknown credibility," that the appellant could have responded "wait a minute" because he was suspicious of a stranger coming to his door to request drugs, and that leaving the apartment via the back door and driving around was "consistent with the actions of two people who had just been approached by a highly suspicious, unexpected visitor at their door." Further, the appellant maintains that the police did not observe the appellant engage in any illegal behavior prior to the stop.

Our supreme court has explained that

"[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

State v. Pulley, 863 S.W.2d 29, 32 (Tenn. 1993) (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). In other words, reasonable suspicion is "'something more than an inchoate and unparticularized suspicion or hunch . . . [but] considerably less than proof of wrongdoing by a preponderance of the evidence.'" State v. Yeargan, 958 S.W.2d 626, 632 (Tenn. 1997) (quoting Sokolow, 490 U.S. at 7-8). Given this standard, we agree with the trial court that the police had reasonable suspicion to believe the appellant was engaged in drug activity at the time he was seized.

## B. Sufficiency of Evidence

Finally, we will address the appellant's challenge to the sufficiency of the evidence supporting his drug conviction. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In order to sustain the appellant's conviction, the State was required to prove that the appellant knowingly possessed not less than one-half ounce but not more than ten pounds of marijuana with the intent to sell.[2] Tenn. Code Ann. §§ 39-17-417(a)(4), (g)(1). The appellant maintains that the only evidence found on his person was $681 in cash and 11.3 grams of marijuana. He notes that a gram of marijuana contains 28.3 grams. He acknowledges that 52.8 grams of marijuana, drug paraphernalia, weapons, and $920 in cash were found in the apartment. However, he asserts that the State failed to prove that he lived in the apartment, that he possessed the marijuana found in the apartment, or that he had the intent to sell it. However, the record belies this contention.

While police were investigating a tip regarding drug activity at a certain apartment complex, the CI knocked on the door of 1250 W.H. Davis Drive. The appellant opened the door of the apartment. The CI, using street lingo, asked for crack cocaine. The appellant responded, "[O]kay, wait a minute." After the appellant was arrested, Officer Deslauriers found documents in the appellant's car that reflected the appellant had, on multiple occasions, provided 1250 W.H. Davis Drive as his address. Although the appellant said that he lived with his girlfriend, she told police that the appellant lived at the apartment complex. Accordingly, we conclude the proof sufficiently linked the appellant to the apartment.

Further, as the appellant concedes, he had $681 in cash and 11.3 grams of marijuana on his person. In and around the apartment were three sets of digital scales, torn plastic baggies, a gun, and ammunition; items police said were commonly possessed by drug dealers. Inside the residence, police found $920 in mostly small bills. Lieutenant Mackall said drug dealers typically kept large amounts of currency in small bills to make change during their transactions. The amount of marijuana found in the apartment, 52.8 grams of marijuana, was much larger than the amount usually kept for personal use. See Tenn. Code Ann. § 39-17-419 ("It may be inferred from the amount of a controlled substance . . . , along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing."). We conclude the evidence, was sufficient to support the appellant's conviction of possessing not less than one-half ounce but not more than ten pounds of marijuana with the intent to sell.

---

[2] The appellant concedes that "[t]he proximity of the child care agency is not in question."

### III. Conclusion

In sum, we conclude that the trial court correctly denied the appellant's motion to suppress and that the evidence was sufficient to sustain the appellant's drug conviction. Accordingly, we affirm the judgments of the trial court.


_____
NORMA McGEE OGLE, JUDGE